**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **TERESA CLIFTON GOLDEN AND BRIAN GOLDEN** | * * * | **CIVIL ACTION NO.: 3:13-cv-547-JWD-SCR** |
| **VERSUS** | * * | **JUDGE: JOHN W. DEGRAVELLES** |
| **COLUMBIA CASUALTY COMPANY, ET AL.** | * | **MAG. JUDGE: STEPHEN RIEDLINGER** |

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

**MAY IT PLEASE THE COURT:**

The Goldens filed this suit because Livingston Parish Sheriff's deputy Brandon Johnson arrested, threw to the floor, and handcuffed, Teresa Golden inside her own home. Teresa was not wanted or suspected of any crime nor had she committed any crime when Johnson brutalized her. The facts material to this motion are established by Johnson's own deposition testimony.[1]

## I. Johnson's own testimony establishes his liability.

The events giving rise to the suit began on the night of June 4, 2013, while Teresa and Brian Golden were asleep in bed at their home in Walker, Louisiana. Brian was awakened by a heavy knock on the front door followed by pounding on the back door. At the door were Johnson and Deputy Steven Erdey. The deputies were there solely to check on Teresa's welfare.[2] At the time, Johnson was a uniform patrol deputy. Soon after the events in suit, the sheriff transferred him to work in the jail.[3]

---

1 Relevant portions of the transcript of the April 29, 2014 Deposition of Brandon Johnson are annexed hereto as **EXHIBIT A.**
2 **EXHIBIT A**, p. 24, lines 1-3.
3 *Id.*, p. 5, line 24 – p. 6, line 22.

The deputies' welfare check on Teresa was prompted by a phone call from Teresa's sister, Deanna Amalio, who called from Michigan to report that Teresa might be suicidal.[4] Once Johnson entered the Golden home, he confirmed that Teresa was not committing suicide but was **asleep in the bedroom**.[5] Johnson left Erdey in the bedroom with Teresa and went outside to call Amalio.[6] Johnson reached Amalio by telephone and asked her about a conversation she had had with Teresa earlier that day.[7] After speaking to Amalio, Johnson went back inside.[8]

When Johnson reentered the home, Teresa was in the kitchen along with Brian and Deputy Erdey.[9] Johnson then asked Teresa about a conversation she had with Amalio earlier that day.[10]. Teresa responded that her sister was crazy and was dying of breast cancer.[11] Teresa then became angry.[12]

While everyone was in the kitchen, Teresa made a phone call. At some point, Johnson told Teresa to get off the phone.[13] Johnson did not want Teresa to talk on the phone in case she was assembling "a posse with guns to come over [.]"[14] According to Johnson, he did not know to whom Teresa was talking but, regardless, he does not allow people to make phone calls in his presence.[15] Johnson testified that he is not aware that a person has a right to call a lawyer when the police come to the person's house for a welfare check.[16] Johnson does not know whether

4 *Id.*, p. 39, line 15 – p. 40, line 13.
5 *Id.*, p. 37, lines 22-24; p. 39, lines 10-14.
6 *Id.*, p. 37, line 24 – p. 38, line 2.
7 *Id.*, p. 39, line 15 – p. 40, line 13.
8 *Id.*, p. 42, lines 15-18.
9 *Id.*, p. 42, lines 19-21; p. 93, lines 15-22.
10 *Id.*, p. 94, line 18 – p. 95, line 14.
11 *Id.*, p. 93, lines23 – p. 94, line 2.16, lines 17-19.
12 *Id.*, p. 95, lines 15-16.
13 *Id.*, p. 42, line 19 – p. 43, line 1.
14 *Id.*, p. 43, lines 7-19.
15 *Id.*, p. 43, line 24 – p. 44, line 1.
16 *Id.*, p. 46, lines 9-24.

Teresa had a right to have counsel present or to call an attorney, or whether she was attempting to secure counsel, a fact she will testify at trial.[17] Nevertheless, Johnson testified that a person only has a right to counsel in a criminal proceeding and that "**You have the right to an attorney <u>if you're being questioned in regards to where there can be a seizure of your person</u>. <u>But that wasn't the case here</u>**; so I don't see why there would be a legal right to counsel if there wasn't any criminal charges being pursued."[18]

Notwithstanding Johnson's testimony that Teresa had no right to call a lawyer because she could not be seized, Johnson then began to seize Teresa's person and handcuff her.[19] Johnson did so because he could see a beer bottle and metal tea kettle in the kitchen and because he assumed that the Goldens, like everyone else, have cutlery somewhere in their kitchen.[20] That is, because Teresa was standing in her kitchen where there were potential weapons that she could potentially use to potentially harm people, Johnson decided to handcuff her.[21] Teresa was irate but never threatened anyone with physical violence.[22] Nevertheless, Johnson decided to handcuff Teresa because he "was not comfortable with the way things were going."[23] According to Johnson, "**<u>if</u>** she would have turned to any type of aggravated battery, **that becomes a deadly force encounter**."[24] That is, if Teresa grabbed a potential weapon in her kitchen and if she turned it on someone else, Johnson would have used deadly force and killed her. Despite the supposed potential of "a deadly force encounter," neither Johnson nor Erdey bothered to suggest that Teresa

---

17 *Id.*, p. 47, lines 1-.25.
18 *Id.*, p. 46, lines 17-24 (emphasis added).
19 *Id.*, p. 97, line 24 – p. 98, line 14.
20 *Id.*, p. 96, line 16 – p. 97, line 10.
21 *Id.*, p. 98, lines 6-14;
22 *Id.*, p. 99, lines 2-9.
23 *Id.*, p. 99, lines 14-15.
24 *Id.*, p. 99, lines 20-22 (emphasis added).

move from the kitchen to another room.[25]

In any event, Johnson told Teresa that she was not under arrest but that he was going to handcuff her anyway for everyone's safety.[26] According to Johnson, Teresa then pulled away and screamed an obscenity.[27] Johnson then walked behind Teresa to put one handcuff on her.[28] Johnson testified that when he did so, Teresa pulled her hand away.[29] Johnson then "pulled her hand back down and executed a straight arm bar takedown."[30]

A straight arm bar takedown is a "pressure point control tactic" in which the policeman puts someone in a prone handcuffing position by force.[31] Johnson thus forced Teresa down on the floor with her arms behind her and his knee in her back.[32] According to Johnson, when Teresa refused to yield her left arm, Erdey stepped in, grabbed Teresa's left arm and handcuffed it.[33] It is undisputed that Teresa's head hit a wall in the kitchen while Johnson was in the process of seizing and handcuffing her.[34]

Johnson admitted that he did not have the ability to determine whether Teresa was in fact suicidal but that the coroner would have to make that determination.[35] Johnson also testified that he forced Teresa to the ground and handcuffed her because Teresa "wasn't understanding of her sister's illness" and was screaming and hollering at people rather than calmly explaining that her sister had cancer, was on medication, and that there were problems with her sister

25 *Id.*, p. 112, lines 19-24.
26 *Id.*, p. 113, lines 7-17.
27 *Id.*, p. 112, line 25 – p. 113, line 6; p. 116, lines 6-17.
28 *Id.*, p. 115, lines 15 – 16.
29 *Id.*, p. 116, lines 16-17.
30 *Id.*, p. 116, lines 17-18.
31 *Id.*, p. 113, lines 7-17.
32 *Id.*, p. 117, line 21 – p. 119, line 2.
33 *Id.*, p. 119, lines 5 – 7.
34 *Id.*, p. 120, lines 7-10.
35 *Id.*, p. 128, lines 6-25.

misunderstanding things in the past.[36] The coroner ultimately arrived, examined Teresa, and informed Johnson that Teresa was not in fact suicidal.[37]

After the coroner determined that Teresa was not suicidal, Johnson informed Teresa that she was under arrest.[38] Johnson testified that Teresa was not arrested until the moment he told her she was under arrest and then advised her of her rights per *Miranda*.[39] Although the DA refused all charges, Johnson claimed that Teresa was guilty of resisting an officer for pulling away from him when he tried to handcuff her and of battery of a police officer for supposedly kicking him **while she was face-down on the floor**.[40]

## II. Johnson's conduct was unreasonable and unlawful as a matter of clear and well established law.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Similarly, Article I, Section 5 of the Louisiana Constitution provides:

> Every person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy. No warrant shall issue without probable cause supported by oath or affirmation, and particularly describing the place to be searched, the persons or things to be seized, and the lawful purpose or reason for the search. Any person adversely affected by a search or seizure conducted in violation of this Section shall have standing to raise its illegality in the appropriate court.

36 *Id.*, p. 129, line 11 – p. 130, line 20.
37 *Id.*, p. 135, lines 14 – p. 136, line 15.
38 *Id.*, p. 135, line 16 – p. 138, line 4.
39 *Id.*, p. 137, line 5 – p. 138, line 7.
40 *Id.*, p. 138, line 8 – p. 140, line 14.

In this case, Johnson and Erdey did not have an arrest warrant, a search warrant, a commitment order, or any other legal process authorizing them to search or seize Teresa.[41] Their only justification for going to the Golden home in the first place was to check on Teresa's welfare in case she was suicidal and needed medical help. Even then, an adult has a right to refuse any medical treatment. La. R.S. 40:1299.56 ("Nothing contained herein shall be construed to abridge any right of a person eighteen years of age or over to refuse to consent to medical or surgical treatment as to his own person.") Further, free citizens in this country have a long-recognized constitutionally protected liberty interest in refusing unwanted medical treatment. *Cruzan v. Director Missouri Department of Health*, 497 U.S. 261 (1990). Even a convict may not be subjected to psychiatric treatment against his will without constitutionally guaranteed due process. *Vitek v. Jones*, 445 U.S. 480 (1980).

Thus, Johnson went to Teresa's home to offer her help that she had a legal right to refuse. Nevertheless, Teresa never even had the opportunity to refuse medical treatment but simply did not immediately submit to being handcuffed in her own home, in the middle of the night, by an armed deputy, who was wholly unqualified to determine whether Teresa required any medical treatment in the first place. The only medical treatment Teresa ultimately required was for the injuries Johnson caused her Teresa by attacking her without any legal justification

**A. False arrest, false imprisonment, and unlawful seizure**

"Arrest is the taking of one person into custody by another." La. Code Cr. Pro. art. 201. "To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one

41 *Id.*, p. 23, lines 17-25.

arresting him." *Id.*

An arrest is also a Fourth Amendment seizure. "Whenever an officer restrains the freedom of a person to walk away, he has seized that person." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985), citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975). In *United States v. Mendenhall*, 446 U.S. 544, 554, (1980), the Supreme Court stated that "any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account all of the circumstances surrounding the incident in each individual case." The *Mendenhall* Court also stated that in determining whether a person has been seized under the Fourth Amendment, **one must determine whether a reasonable person would have believed he was free to leave.** *Mendenhall*, 446 U.S. at 554. The Louisiana Supreme Court has also considered this issue and determined that "**it is the circumstances indicating intent to effect an extended restraint on the liberty of the accused, rather than the precise timing of an officer's statements: 'You are under arrest,' that are determinative of when an arrest is actually made**." *State v. Giovanni*, 375 So.2d 1360, 1363 (La.1979) (quoting *State v. Sherer*, 354 So.2d 1038, 1042 (La.1978)); *see also State v. Simms*, 571 So.2d 145, 148 (La.1990). Accordingly, a person who is not free to leave has been arrested as a matter of law.

In this case, Johnson testified that Teresa "was not free to go" while he was in her home ascertaining the facts of the case.[42] Johnson also testified that handcuffing Teresa was not the same as arresting her, and that Teresa was not arrested when he handcuffed her.[43] Further, Johnson testified that Teresa was never free to leave her house at any time after Johnson arrived:

---

42 *Id.*, p. 34, lines 21-25.
43 *Id.*, p. 106.

Q. Was Teresa free to leave her house --

A. No, she was not.

Q. -- when she -- no?

A. No, sir.

Q. **At no point after you came over was she free to leave the house. Right**?

A. **No, sir**.

Q. No, that's -- no, she was free --

A. **No, sir, she was not free to leave the house**.[44]

As a matter of law, therefore, Johnson arrested Teresa the instant he walked into her house and she was no longer free to leave. Nevertheless, Johnson believes that Teresa was not arrested because she was only "being detained."

Q. And, in fact, she was under arrest the moment she wasn't free to leave the house. Right?

A. No.

Q. Why not?

A. Because she was being detained. It's no different than a traffic stop.[45]

44 *Id.*, p. 107, lines -11 (emphasis added).
45 *Id.*, p. 114, lines 5-11.

Indeed, when asked "What's the difference between a detention and an arrest?" Johnson responded, "**The detention is done while we gather facts of the case. An arrest is a seizure of her person**."[46] Johnson's claim that an investigative detention "is when somebody is not under arrest but they are not free to go" means that he does not know the most basic aspects of the law he is sworn to uphold.[47] But even seizing Teresa's person, pulling her arm straight behind her and forcing her face-first to the ground with his knee in her back was not an arrest according to Johnson but merely an "investigative detention."[48] Well established law says otherwise.

An investigatory detention is a "*Terry* stop" and it may not occur inside a private home. While an arrest requires officers to have probable cause to believe that a suspect has committed a crime, an investigatory stop requires a lesser standard of "reasonable suspicion." *Terry v. Ohio*, 392 U.S. 1 (1968). In Louisiana, the investigatory *Terry* stop is codified in La. Code Crim. Proc. art. 215.1(A): "A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions." Like an arrest, an investigatory stop entails a complete restriction of movement, although for a shorter period of time. *State v. Bailey*, 410 So.2d 1123, 1125 (La.1982).

In making a brief investigatory stop, the police "must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *State v. Kalie*, 96-2650, p. 3 (La.9/19/97), 699 So.2d 879, 881 (quoting *United States v. Cortez*, 449 U.S. 411, 417-418 (1981)). Specifically, article 215.1 requires that an officer point to specific and articulable facts to justify an

46 *Id.*, p. 114, lines 12-21 (emphasis added).
47 *Id.*, p. 27, lines 13-16.
48 *Id.*, p. 27, lines 13-16.

investigatory stop. *State v. Huntley*, 97-0965, p. 3 (La.3/13/98), 708 So.2d 1048, 1049.

***Pre-Crime is No Crime.***

In this case, Johnson did not stop Teresa in a public place but threw her to the ground and handcuffed her on private property, inside her own home. Because Johnson did not stop Teresa in a public place, his detention of her was unlawful on that basis alone.

By his own admission, Johnson had no probable cause to arrest Teresa. Further, Johnson did not reasonably suspect Teresa of a crime but knew that he required reasonable suspicion to conduct even a true *Terry* stop:

Q. Okay. What do you need for an
investigative detention?

A. Reasonable suspicion.

Q. Reasonable suspicion of what?

A. Of -- of the -- of a possibility that
a crime has been committed or anything like
that. She was being detained for safety
purposes because I thought that she was going
to escalate things further into a physical
altercation.[49]

Because Johnson seized Teresa's person "for safety purposes" without any suspicion that she was possibly involved in any particular criminal conduct, he had no lawful basis for detaining Teresa at all; especially by violence and in her own home. Moreover, even a true *Terry* stop only

49 *Id.*, p. 27, line 22 – p. 28, line 6.

excuses the minimal physical contact entailed by a frisk for weapons.

An officer's right to conduct a protective frisk is codified in La.Code Crim. Proc. art. 215.1(B), which provides that "[w]hen a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon." An officer is **never** justified in conducting even a pat-down for weapons unless the original investigatory stop itself was justified, and even a lawful detention for questioning does not automatically give the officer authority to conduct a pat-down for weapons. *State v. Hunter*, 375 So.2d 99, 101 (La.1979). Even after a lawful investigatory stop, a police officer may frisk the suspect **only** where a reasonably prudent person would be warranted in the belief that his safety or that of others is in danger. La.Code Crim. Proc. art. 215.1(B); *Terry*, 392 U.S. at 21. The reasonableness of a frisk is thus governed by an objective standard. *State v. Dumas*, 00-0862, pp. 2-3 (La.5/04/01), 786 So.2d 80, 81.

The officer's suspicion that he is in danger is not reasonable unless the officer can point to **particular facts which led him to believe that the individual was armed and dangerous**. *Hunter*, 375 So.2d at 101. The officer must establish a "substantial possibility" of danger. *Id*. at 102. In determining the lawfulness of an officer's frisk of a suspect, courts must give due weight, not to an officer's "inchoate and unparticularized suspicion or `hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 21.

In this case, Johnson thought that Teresa might commit a battery but conceded that his thought "was not based on anything more than just a possibility."[50] Johnson testified that he could

50 *Id.*, p. 28, line 19 – p. 29, line 2.

have handcuffed Teresa in her bedroom – before she was anywhere near the kitchen cutlery – because "[t]here could be a gun under the pillow."[51] Indeed, because anybody could have a gun under the pillow, Johnson testified that it could be reasonable to handcuff anybody in his bedroom under any circumstances.[52]

Ultimately, the only justification Johnson provided for throwing Teresa to the floor and handcuffing her is because she was in her kitchen, without any weapons but near ordinary household items that she could have grabbed, could have used as weapons, and could have attacked others with:

A. . . . I think that if she would have started
grabbing other things and used those in some
sort of attack, then that's when you start
getting towards things -- people getting hurt,
people getting severely hurt.

Q. **And that was strictly hypothetical.**
**Right? That *could* have happened**?

A. **Yes, sir**.[53]

Thus, Johnson violently seized and restrained Teresa based on a strictly hypothetical scenario which could just as easily apply to anybody. In fact, Johnson's testimony makes clear that he simply did not like Teresa's tone and attitude. But just because a householder is gauche enough not to extend a warm welcome when the police come in the night, unbidden, and in

51 *Id.*, p. 105, lines 13-22.
52 *Id.*, p. 105, line 21 – p. 106, line 9.
53 *Id.*, p. 112, lines 11-18.

response to a long distance call involving an unsubstantiated concern about something that is not even a crime, she does not deserve to be arrested, brutalized, and hauled off to jail.

"[T]he tort of false arrest or false imprisonment occurs when one arrest and restrains another against his will and without statutory authority." *Bellanger v. Webre*, 2010-0720 (La. App. 1 Cir. 5/6/11), 65 So.3d 201, 209. There are thus two elements to the tort: (1) detention of the person; and (2) unlawfulness of the detention. *Id*. To establish a federal claim for unlawful detention, a plaintiff must show that: (1) a detention occurred; and (2) the detention was not based on reasonable suspicion supported by articulable facts that criminal activity was occurring. *Coons v. Lain*, No. 07–40819, 277 Fed. App'x 467, 470, 2008 WL 1983580 (5th Cir. May 8, 2008); citing *Michigan v. Summers*, 452 U.S. 692, 699 (1981); *Terry v. Ohio*, 392 U.S. 1, 30, (1968). Both elements of both claims are satisfied in this case: Johnson detained Teresa and had no right to do so. Johnson had no probable cause to believe that Teresa had committed a crime and thus no justification to arrest her. Nor did Johnson have any reasonable suspicion as a matter of fact or law, nor the ability to conduct a valid *Terry* stop inside the home as a matter of law. Even if Johnson could perform a warrantless investigative detention inside the home, he would only have been authorized to perform a pat-down for weapons – weapons he already knew were not on Teresa's person.

Because Johnson had no right to arrest or detain Teresa in the first place, he had no right to attack her for reasons stronger still. As a result, he is liable for battery and the unreasonable use of excessive force.

**B. Battery and the unreasonable and excessive use of force**

Louisiana law defines battery as "[a] harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff to suffer such a contact." *Caudle v. Betts*, 512 So.2d 389, 391 (La. 1987). A Louisiana law enforcement officer will be guilty of a battery if he engages in an act intended to cause a person harmful or offensive contact unless the act in question involves the officer's use of reasonable force to restrain an arrestee. *Ross v. Sheriff of Lafourche Parish*, 479 So.2d 506, 511 (La. App. 1st Cir. 1985).

In this case, Teresa committed no crime and was suspected of no crime. At the time he battered Teresa, Johnson had no probable cause that she had committed any crime and had no reasonable suspicion that Teresa or anyone else had committed any crime or was about to commit a crime that was anything more than hypothetical. Nevertheless, Johnson claims that he had the right to handcuff Teresa pending an investigation and had the right to use a straight arm bar takedown to do so. He conceded that Teresa was never a "suspect" because she was never suspected of any crime. Nor was she ever an "arrestee" except insofar as she was a victim of false arrest. Johnson is liable for his excessive and unreasonable use of force as a matter of state law and federal law.

An excessive force claim under Section 1983 is "separate and distinct from" a claim for unlawful arrest (or detention) and must, therefore, be analyzed without regard to whether the arrest/detention was justified, although the evidence may overlap. *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir.2007); *Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir.2007). To prove a claim for excessive force, a plaintiff "must show: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly

unreasonable." *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir.2012)(quoting *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir.2009)(internal quotation marks omitted)). Factors integral to the analysis of reasonableness include: "(1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response." *Keele v. Leyva*, No. 02–5104, 69 F. App'x 659, 2003 WL 21356063 at *1 (5th Cir. May 30, 2003)(citing *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992)).

**1. Johnson caused Teresa an injury**

The nature and extent of all Teresa's physical and emotional injuries and damages are not the subject of this motion. Nevertheless, even defendants concede that Teresa suffered an injury as a result of Johnson's use of force.[54] Although defendants describe Teresa's head wound as "slight," they admit it required medical attention.[55] This head injury alone is more than sufficient as a matter of law.

It is well established that "[t]he injury must be more than a *de minimus* physical injury, but need not be significant or serious." *Keele*, 69 F. App'x 659 at *2, *citing Gomez v. Chandler*, 163 F.3d 921, 924 (5th Cir.1999). Further,the injury "'**must be evaluated in the context in which the force was deployed**.'" *Namer v. Gentrey*, 273 F.3d 392, 2001 WL 1013077 at *3 (5th Cir.2001)(citing *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir.2001))(emphasis added). The Fifth Circuit has held that, in determining whether a Fourth Amendment injury is more than *de minimus*, "a court must 'look to the context in which that force was deployed[ ] ... [as] related to the amount of force that is constitutionally permissible under the circumstances. What constitutes

54 Status Report, R. Doc. 10, p. 5.
55 *Ibid.*

an injury in an excessive force claim is therefore subjective—it is defined entirely by the context in which the injury arises.'" *US v. Diaz*, No. 11–51020, 498 F. App'x 407, 411, 2012 WL 5910944 (5th Cir. Nov. 27, 2012)(quoting *US v. Brugman*, 364 F.3d 613, 618 (5th Cir.2004)(internal quotation marks and citation omitted). Moreover, "'physical pain' may, depending on the context in which the injury arose, constitute 'bodily injury' sufficient to overcome the *de minimus* threshold." *Id*. 498 F. App'x at 412.

In this case, it is undisputed that Teresa suffered at least "some injury" as a consequence of Johnson's use of force. The Goldens will testify that Johnson deliberately pushed Teresa head-first into a wall when he attempted to handcuff her. While Johnson claims this is a lie, he admits that Teresa's head hit a wall when he was trying to handcuff her.[56] Johnson's testimony therefore confirms that Teresa suffered an injury as a result of his use of force.

**2. Johnson's use of force was clearly unreasonable.**

The reasonableness of Johnson's use of force requires assessing the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). None of these factors justifies the use of any force in this case.

There was no crime at issue in this case, much less a severe one. Teresa posed no threat to the safety of the officers or others, much less an immediate threat. The only threat was "strictly hypothetical" and existed only in Johnson's mind (along with the potential of an armed posse at the other end of Teresa's telephone). Last, Teresa was not actively resisting arrest or attempting to

56 **EXHIBIT A**, p. 120, lines 1-20.

evade arrest by flight. According to Johnson, throwing Teresa to the floor and handcuffing her was not even an arrest. Moreover, Teresa was in her own home, not fleeing a crime scene. Because Johnson's conduct under these circumstances had no justification as a matter of fact or law, the Goldens are entitled to summary judgment on these claims as a matter of law.

## III. The Goldens are entitled to judgment as a matter of law.

The summary judgment procedure is designed "to secure the just, speedy, and inexpensive determination of every action." *Celotex v. Catrett*, 477 U.S. 317, 327 (1986). Accordingly, "[a] party may move for summary judgment, identifying each claim or defense – **or the part of each claim or defense** – on which summary judgment is sought. The court **shall** grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a) (emphasis added).

In this case, Johnson's own deposition testimony establishes that he battered, falsely arrested, and imprisoned Teresa in violation of Louisiana state law and clearly established rights under the United States Constitution. The facts as described by Johnson himself are equally clear and establish all the essential elements of the Goldens' claims arising under federal law for Johnson's false arrest, unlawful seizure, and use of excessive and unreasonable force against Teresa violating the Fourth Amendment, and with respect to the claims arising under Louisiana state law for Johnson's battery and false arrest/false imprisonment of Teresa. The Goldens are therefore entitled to judgment as a matter of law. Accordingly, the Court should render partial summary judgment in favor of plaintiffs and against defendant Johnson with respect to these claims, reserving all other claims and issues for future motion practice or trial.

Respectfully submitted:

/s/ Kearney S. Loughlin
KEARNEY S. LOUGHLIN
La. State Bar No. 26391
6030 Prytania Street
New Orleans, Louisiana 70118
Telephone: (504) 891-3193
Facsimile: (504) 891-3195
**Attorney for Plaintiffs, Teresa Clifton Golden and Brian Golden**

CERTIFICATE

I hereby certify that a copy of the above and foregoing has been served upon all counsel of record via U.S. Mail, postage prepaid and properly addressed, by hand, by electronic transmission though the Court's CM/ECF system, or by facsimile transmission, this 5th day of March 2015.

s/ Kearney S. Loughlin