# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**TERESA CLIFTON GOLDEN, ET AL.**

**v.**

**COLUMBIA CASUALTY COMPANY, ET AL.**

**CIVIL ACTION**

**NO. 13-547-JWD-SCR**

## RULING AND ORDER

This matter comes before the Court on the following motions:  (1) the Motion for Partial Summary Judgment (R. Doc. 39) by Plaintiffs Teresa Clifton Golden and Brian Golden (the "Plaintiffs"); (2) the Cross-Motion for Partial Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment on Behalf of Deputy Brandon Johnson (R. Doc. 52);  (3) the Motion for Partial Summary Judgment on Behalf of Sergeant Steven Erdey (R. Doc. 53); and (4) the Motion for Partial Summary Judgment on Behalf of Columbia Casualty Company (R. Doc. 56).  The motions are opposed. (R. Docs. 52 & 62).  Oral argument was heard on May 7, 2015.[1]

The parties agree on the broad strokes of what happened on the night of the incident, but they dispute the details.  These factual disputes are made more complicated by the fact that cross-motions for summary judgment have been filed, thereby requiring the Court to construe the facts in the light most favorable to each side for purposes of the other's motion.

The basic undisputed facts are these.  On June 4, 2013, the Livingston Parish Sheriff's Office received a 911 call from Teresa Golden's sister, Deana, who said that Teresa was suicidal.

---

[1] The Court also heard oral argument on (1) the Motion for Partial Summary Judgment on Behalf of Sheriff Jason Ard, Major Jim Brown, and Captain Chad McGovern (R. Doc. 55); (2) the Objection to Magistrate's Order (R. Doc. 36) filed by Plaintiffs; and (3) the Motion in Limine by Plaintiffs.  The Court issued a ruling on the Objection and the Motion in Limine on May 21, 2015 (R. Doc. 67).  The Court will issue a ruling on the Motion for Summary Judgment as to Ard, Brown, and McGovern shortly after issuing this ruling.

Defendants Sergeant Steven Erdey and Deputy Brandon Johnson received a call from dispatch and arrived at the Plaintiffs' home. Erdey and Johnson entered the home and discovered Teresa sleeping. Johnson went outside to call and question Deana about her call to 911. Erdey went into the kitchen with the Plaintiffs. Johnson returned and, with paramedics present, started questioning Teresa.

As Johnson began questioning Teresa, she became angry and upset. After getting on the phone to call for help, Johnson moved to detain her further by placing her in handcuffs. Teresa's head struck the wall, either (as Plaintiffs contend) because Johnson intentionally and without justification slammed it there, or (as Defendants contend) because her head inadvertently hit the wall as Teresa was resisting. Further, while Teresa was resisting the handcuffing, Johnson executed a straight arm bar takedown and, with Erdey's help, completed the handcuffing.

Teresa sat on the couch until the coroner arrived. The coroner performed a medical exam and determined that Teresa was not suicidal. After the testing was complete, Johnson placed Teresa under arrest for committing the crimes of "Resisting an officer" and "Battery of a police officer." Specifically, Johnson claimed that Teresa resisted the handcuffing and kicked him while she was being handcuffed.

Johnson completed an "affidavit" to establish probable cause to further detain Teresa, and, allegedly, a state district court judge found probable cause. However, Johnson's affidavit was not signed in the presence of a notary.

Teresa and Brian Golden filed suit against Johnson, Erdey, Sheriff Ard, Major Brown, and Captain McGovern, as well as their insurer, Columbia Casualty Company ("Columbia"). Plaintiffs claimed (a) battery, (b) assault, (c) false arrest, (d) false imprisonment, (e) intentional infliction of emotional distress, (f) unlawful search and seizure, (g) cruel treatment, (h) failing to

provide medical attention, (i) violation of the Constitution and other laws of the United States and of the State of Louisiana, (j) excessive use of force, (k) unreasonable use of force, (l) malicious prosecution, and for other acts and omissions. (Complaint, R. Doc. 1, p. 10).

Having carefully considered the parties' briefs, the facts in the record, and the law, the Defendants' motions (R. Doc. 52, 53, & 56) are granted in part and denied in part. The Court dismisses the claims against Johnson, Erdey, and Columbia (1) for Johnson and Erdey's alleged unlawful entry into the Plaintiffs' home in violation of the Plaintiffs' Fourth Amendment rights; (2) for malicious prosecution under federal law; (3) for the alleged failure to provide medical care in violation of Teresa Golden's Fourth Amendment rights; and (4) for punitive damages under Louisiana state law. Further, the false arrest claims against Erdey under the Fourth Amendment and Louisiana state law are dismissed, but the unlawful seizure claim against him under the Fourth Amendment and false imprisonment claim against him under Louisiana state law survive. In all other respects, the Defendants' motions are denied. The Court further denies the Plaintiffs' Motion for Partial Summary Judgment (R. Doc. 39).

## RELEVANT FACTUAL BACKGROUND

### I.     *The 911 Call*

On June 4, 2013, Deana Amalio, sister of Plaintiff Teresa Golden, called 911 (See Declaration of Carl Varnado …, R. Doc. 52-3). Defendants submitted an audio recording of the call. In that recording, Deana said that she was calling from Michigan but that she received a call from her sister who lives in Walker, Louisiana. Deana was not sure if her sister was drunk, but Deana said her sister had a history of suicidal tendencies. According to Deana, Teresa was crying and kept telling Deana that she was sorry and was an organ donor. Deana had gone "through this too many times." Deana also stated that she did not think Teresa had any weapons.

However, there were children in the home. Deana went through this in Michigan "for years." Further, Teresa had previously "cut herself." Teresa purportedly said, "I'm so sorry, I just want to tell you I love you, and I'm an organ donor." Teresa was also unresponsive to calls and texts.

The audio recording also reflects that, after the call with Deana, the 911 operator tried four consecutive times to call a number, but he received a voicemail each time. Presumably, the operator was trying to reach Teresa.

## II.    *The Officers Arrive on the Scene, Check on Teresa, and Detain the Goldens*

The parties agree that, on the night of June 4, 2013, Sergeant Erdey and Deputy Johnson were dispatched to the Golden's residence. Significantly, there is no evidence establishing that the officers knew of the contents of the 911 call.[2]

Moreover, there is conflicting testimony on what happened when the officers arrived at the house. Plaintiff Brian Golden testified that he heard a knock on the door, and, when he opened it, he saw Sergeant Erdey about fifteen feet in the grass. (B. Golden Depo., R. Doc. 52-4, p. 5). Erdey asked if Teresa Golden lived there, and Brian responded that she was asleep. (*Id*.). Erdey asked who else was in the house, and Brian responded that three kids, a dog, and two cats were there. (*Id*.). Erdey asked to speak with Teresa. (*Id*.). Brian asked what it was in regards to, but, according to Brian, Erdy refused to tell him why. (*Id*., p. 5-6). Brian said he would go get her, and he "turned around, walked down the small hallway." (R. Doc. 52-4., p. 6). Brian said that the "door swings back" automatically. (*Id.*). Brian never instructed Erdey to refrain from going into the house, but the door closed on its own. (*Id.*).

---

[2] As will be shown below, Johnson mentions getting a call from dispatch, and he states that he has Deana's number in his computer. He mentions that, after talking to Teresa, he had "conflicting stories," but there is no evidence establishing the substance of these stories.

Steven Erdey, on the other hand, said that when Brian asked why the officers were there, Erdey replied, "We have a call that Teresa Golden is suicidal, and we need to physically put eyes on her to make sure if she's still alive." (Erdey Depo., R. Doc. 52-6, p. 4). Erdey testified that Brian invited him in. (*Id.*).

Johnson testified that he was invited in by a homeowner. (Johnson Depo., R. Doc. 52-5, p. 4). Johnson could not remember Brian's exact words, but Johnson gathered from whatever Brian said that they were invited into the residence. (*Id.*, p. 8). Johnson denied that Brian said to stay outside or wait here. (*Id.*, p. 9). Johnson further said that he thought he had the right to enter even if he had not been invited to ensure Teresa's safety; Johnson could not take someone else's word, and he did not know whether Teresa would attempt to speed up a suicide attempt after knowing that someone was there to stop it. (R. Doc. 53-6, p. 7).

After the officers went into the Golden house, Johnson confirmed that Teresa was not actively committing suicide. (R. Doc. 39-2, p.13-15). Rather, Teresa was asleep. (*Id.*).

Significantly, Johnson testified that Teresa was not free to leave once he got to the house. (*Id.*, p. 54). Teresa was not arrested upon his arrival; instead, she was being detained so that the officers could gather facts. (*Id.*, p. 42).

Acadian Ambulance paramedics did not enter initially with the officers. (Johnson Depo., R. Doc. 39-2, p. 13). The paramedics arrived later. (*Id.*).

### III. *The Responders' Roles at the Scene*

The Defendants' witnesses seemed to agree that the officers' job was to check on Teresa's welfare and to secure the premises for all persons at the scene, before the paramedics arrived and after. (Johnson Depo., R. Doc. 39-2, p.5 & R. Doc. 53-6, p. 4; Erdey Depo., R. Doc. 52-6, p. 2, 11). The officers testified that Acadian was supposed to determine if Teresa was

suicidal. (Johnson Depo, R. Doc. 53-6, p. 4; Erdey Depo., R. Doc. 52-6, p. 2, 11). Alex Fair and Kyle Sloan, the paramedics at the scene, stated that Acadian does not actually make the determination of whether somebody is suicidal or not; they determine whether or not they feel someone is in need of further evaluation. (Fair Depo., R. Doc. 63-2, p.2; Sloan Depo., R. Doc. 63-1, p. 2).

### IV.    *Johnson's Talk with Deana And Erdey's Talk with the Goldens*

After seeing she was asleep, Johnson went back outside to contact Teresa's sister Deana to figure out what happened and to ask Deana about the conversation she had with Teresa earlier that day. (Johnson Depo., R. Doc. 39-2, p. 14-15). Once Teresa denied that she made any suicidal statements, Johnson wanted to hear the sister's side of the story first-hand. (Johnson Depo., R. Doc. 52-5, p. 12).

Johnson did not remember exactly what Deana said, but he remembered certain things. (Johnson Depo., R. Doc. 39-2, p. 15-16). The sister purportedly told him that Teresa had attempted suicide in the past on several occasions and that the verbiage that Teresa used when she contacted Deana that evening was the same type of verbiage that Teresa had used before when she attempted suicide. (*Id.*). Johnson said there was "[s]omething to the effect of an apology, something about … being an organ donor, and something else." (*Id.*, p. 15). According to Johnson, Deana said Teresa had previously taken a beer bottle, broke it, and tried to slit her own throat with it, and Teresa also cut her wrists on other occasions. (Johnson Depo., R. Doc. 52-5, p. 13). Teresa allegedly told Deana that Teresa was sorry for what was about to happen and that she loved her. (*Id*. at p. 15).

While Johnson was gone, Teresa and Brian were talking with Sergeant Erdey. (B. Golden Depo, R. Doc. 52-4, p. 7). The three ended up in the kitchen, though there is conflicting

testimony as to who suggested they go there and why. (*Id.*; T. Golden Depo., R. Doc. 52-9, p. 2; Erdey Depo., R. Doc. 52-6, p. 5). Erdey said that, when he told the Goldens about the report that Teresa was suicidal, they said "pretty much" that it was absurd and "let's get to the bottom of it," by allowing Acadian to assess Teresa. (*Id.*, p. 6). Brian thought the paramedics were in the living room at that time, but he was not sure. (B. Golden Depo, R. Doc. 52-4, p. 7). Erdey never spoke to Deana and never listened to the 911 call. (R. Doc. 62-5, p. 26).

V.     *Teresa's Intoxication on the Day of the Incident*

All witnesses agree that, during some parts of the evening, Teresa was drunk. However, the witnesses disagree as to how inebriated she was and at what times in the evening she was intoxicated.

Brian Golden said she "had a bit to drink." (B.Golden Depo., R. Doc. 52-4, p. 3). By 9:00 (presumably p.m.), she was ready for bed. (*Id.*). While Brian thought at one time that she had drank two pints of Jack Daniels, he said he was incorrect because he found the second pint by the microwave. (*Id.*). Brian also said that, when Officer Johnson allegedly threw her head into the wall, Teresa was no longer intoxicated at that point. (B. Golden Depo., R. Doc. 62-6, p. 3). Teresa testified that she was under the influence of alcohol such that her recollection of what happened that night might be a little bit fuzzy, especially when she was speaking with the coroner. (T. Golden Depo., R. Doc. 52-9, p. 2).

The Defendants and paramedics tell a much different version of Teresa's inebriation. Johnson testified that Teresa was "[e]xtremely" intoxicated. (Johnson Depo., R. Doc. 52-5, p. 24). Johnson said she had slurred speech, was unsteady on her feet, "just your typical signs of intoxication." (*Id.*, p. 25). Johnson said that Brian told him that Teresa had two pints of Jack Daniel's, and Johnson had no reason to dispute this. (*Id.*, p. 25-26). Erdey testified that he could

"smell a strong odor of alcohol," that she was "slurring a little bit," and that he could tell she was intoxicated. (Erdey Depo., R. Doc. 52-6, p. 7). Kyle Sloan, a paramedic, testified that he could smell alcohol on her breath and that her husband said she drank two pints of whiskey in a 12-hour span. (R. Doc. 52-7, p. 2). Sloan said she had slightly slurred speech and that she swayed back and forth a little bit (not severely, but "there was a little bit of a balance issue there."). (*Id.*, p. 3). Alex Fair, the other paramedic, testified that he was led to believe that Teresa was intoxicated by the "slurred speech, being unsteady on her feet, her admission that she had been drinking liquor, and the smell of alcohol on her as well." (R. Doc. 52-8, p. 2).

## VI.     *Meeting in the Kitchen and Teresa's Anger and Cooperation*

After speaking with Deana, Johnson went back inside the residence to talk to Mrs. Golden. (R. Doc. 39-2, p. 18). When Johnson returned, Teresa, Brian, and Erdey were in the kitchen. (Johnson Depo, R. Doc. 39-2, p. 24). Johnson then began questioning Teresa about the conversation he had with her sister. (*Id.*).

Johnson said despite seeing Teresa in bed and hearing from her that she was not suicidal, he questioned her because he had not verified the complaint that she was suicidal. (*Id.*, p. 49). Significantly, Johnson admitted that he could not verify the complaint one way or another because he had conflicting stories, so the coroner was going to make the ultimate call. (*Id.*).

The parties agree that, at some point during Johnson's questioning of Teresa, she became angry and upset. However, there is disputed testimony as to how angry she got and the extent to which Teresa cooperated with the officers.

When Johnson asked Teresa about the conversation she had had with her sister, Teresa replied that her sister was crazy and dying of cancer. (*Id.*, p. 24). Specifically, Johnson asked why she told her sister she was an organ donor, apologized, and that she loved her. (*Id.*, p. 25).

Brian did not remember who asked the question, but he just said that the officers got a call that she was suicidal and that the Goldens were shocked and flabbergasted. (B. Golden Depo., R. Doc. 52-4, p. 9). Brian said that, primarily, Deputy Johnson began "aggressively questioning" Teresa about her past, that she had somehow stabbed herself in the throat with a beer bottle to kill herself." (*Id*., p. 10). Brian testified, "that's when I said, this is bullshit, you guys have to go." (*Id*.). Brian tried to answer some of their questions because Johnson was "intimidating [his wife now, she's angry, she's shaking," but Johnson kept telling him to "stop, be quiet" so they can talk to Teresa. (*Id*.).

Teresa became angry at that point. (Johnson Depo, R. Doc. 39-2, p. 25-26). Johnson testified that she began to holler at Brian and that her yelling was "heavily laced with profanities" and was "very loud." (*Id*., p. 26). According to Johnson, she was also "gesticulating wildly while doing this." (*Id*.). She had "exaggerated movement" and would "walk towards Brian and holler at him." (Johnson Depo, R. Doc. 52-5, p. 27). Alex Fair testified that Teresa was using racial slurs and profanities and that she screamed "fuck you" several times. (Fair Depo,, R. Doc. 52-8., p. 5).

Gabrielle Stuart, Teresa's daughter, testified that, when the officer told Teresa that they received a call from Michigan saying that she was suicidal and that she had tried to stab herself in the neck with a broken beer bottle, her mom "went berserk," denied what happened, offered another explanation for the cop's account, and "became hysterical, crying." (R. Doc. 52-10, p. 2).

Alex Fair said that Teresa's level of cooperation through the course of time that he was in the trailer was "[n]ext to nothing." (R. Doc. 52-8, p. 4). "Her behavior escalated. We remained the same. We were calm. We were professional. And she continued to get herself worked up." (*Id*., p. 4).

Sloan, the paramedic, testified that at first, "it was very pleasant, very polite … but after we had mentioned that her sister was the one that had called, she began to become a little bit hysterical and upset." (R. Doc. 52-7, p. 3).  At some point she called someone, but Sloan could not remember.  Sloan did remember that she "began to get hysterical and start walking around the house … in circles." (*Id*.).  Sloan said he was not able to make the assessment he needed to make because Teresa would not calm down and respond to their questions. (*Id.*, p. 4).

At first, Brian testified that he believed Teresa did not cuss whatsoever prior to the moment of the takedown. (B. Golden Depo, R. Doc. 52-4, p. 9).  He then said he did not know. (*Id*.).  Brian said that belligerent was too hard a word to describe his wife's behavior, but she was "[u]ncooperative, yes, perhaps." (*Id*.)  Brian denied that she used racial slurs. (R. Doc. 62-6, p. 7).

Teresa testified that she got angry when she was told that someone called and said she was suicidal. (T. Golden Depo., R. Doc. 52-9, p. 3).  Teresa admitted to cursing, saying it was bullshit, but she could not remember if she used the "'F' bomb." (Id.).  Teresa said she started crying when Johnson asked about trying to stab herself. (*Id*., p. 4).  "[H]e's brining up personal events in my life that, (a), he doesn't know anything about, that are, you know, hurtful to me, and it is being twisted and convoluted into something that it wasn't. … And I'm having to defend something like I'm a criminal in my own house." (*Id*., p. 4).

Teresa testified that she was not uncooperative or belligerent.  (*Id.*, p. 6).  She was acting assertive because she knew her rights and "they were being violated."  (*Id*.).  She admitted to yelling at her husband to get him to help her stand up to the cops and get them out of her house. (*Id*., p. 7).  She said she was cooperating. (*Id*., p. 11).

### VII.    Teresa's Use of the Phone

Teresa testified that she called Ashleigh Vasquez, Teresa's employer, at some point because she was crying, afraid, and frightened for her safety. (R. Doc. 52-9., p. 5; R. Doc. 52-4, p. 2).  Teresa was worried the officers were going to bring her to jail. (*Id*.).  Teresa asked Ashleigh to get in touch with her dad because her dad is an attorney. (*Id*., p. 8).  According to Teresa, Ashleigh asked if she could come over, and that's when the officers said if they came over to help they would be arrested. (*Id*.).  Gabrielle Stuart, Teresa's daughter, confirmed that the officers threatened to arrest Ashleigh for obstructing their investigation.  (R. Doc. 52-10, p. 3).  Teresa testified that Brian told her to put the phone down but did not tell her to calm down. (R. Doc. 52-9., p. 8-9).

At some point, Johnson told Golden to put down the phone. (Johnson Depo., R. Doc. 39-2, p. 19).  Johnson remembered that she was on the phone and that she said something about help me, which struck him because he "didn't know what [']help me['] meant." (Johnson Depo.,  R. Doc. 52-5, p. 3).  Johnson did not know if she meant to "gather some sort of posse with weapons and come over here and shoot the police." *Id.*  Johnson thought that she was trying to circumvent a lawful presence of law enforcement. (Id.).  Johnson said he is "very concerned when people are on the phone" because he does not "know what they're going to say" or "who they're talking to." (Johnson Depo., R. Doc. 39-2, p. 19).  He again testified that he was very concerned that they "could be calling somebody to assemble some sort of posse with guns to come over there to free them from their perceived whatever." (*Id*.)  Johnson did not want someone to show up with guns "trying to fight off a perceived injustice." (*Id*.).  Thus, Johnson does not "allow people to use the phone if they're with [him] for [his] safety and theirs." (*Id*., p. 19-20)  Johnson did not think

someone had a right to a lawyer if criminal charges were not being pursued, as was the case here. (*Id*., p. 22).

Brian testified that he and the officers were telling Teresa to put the phone down. (B. Golden Depo., R. Doc. 52-4, p. 13). She never cussed at Brian, but "She was yelling in desperation, call Shannon, get ahold of Ashleigh, we need a lawyer." (*Id*.). Teresa tried to get up a couple of times, but the officer put his thumb in her breastplate and pushed her back down. (*Id*.). Brian tried to get between them. Gabrielle Stuart testified that she and Brian tried to get Teresa off the phone. (R. Doc. 52-10, p. 3).

Alex Fair testified that both officers said that they would restrain Teresa if she did not get off the phone; "They were very, very clear. We will restrain you if you don't put down the phone." (R. Doc. 53-9, p. 6). Fair testified that they were asking her to put down the phone "Because she wouldn't respond to our questions, so we couldn't complete our medical assessment. It's a psychiatric emergency, so we need to be able to have a conversation with these types of patients. It's not like a visible injury like a cut where we can see what's wrong right away." (R. Doc. 52-8, p. 3-4).

### VIII.    *The Handcuffing of Teresa, Including Her Head Striking the Wall*

While Teresa was on the phone, Johnson restrained her with handcuffs with the assistance of Sheriff Erdey. But there is conflicting testimony as to why this was done and what happened while it was being accomplished.

Alex Fair testified that the ordeal of trying to get Teresa off the phone so that they could make an assessment lasted five or ten minutes, after which time the deputies went to restrain her. (R. Doc. 52-8, p. 2). Fair said the officers told Teresa they were going to restrain her so the paramedics could complete their medical assessment because she was not complying with their

requests and that it was for her own safety. (*Id*. at p.4). The paramedics needed to determine whether or not she was a threat to herself. (*Id*.).

Johnson admitted that, when Teresa was yelling at Brian, up until that time, she had committed no crime. (R. Doc. 53-6, p. 22). Johnson said that Deana had told him that Teresa had attempted to commit suicide by fashioning a beer bottle into a weapon, so he thought that it was noteworthy that Teresa was standing next to a beer bottle and a metal tea kettle, which had a handle on it and could easily be swung. (Johnson Depo., R. Doc. 39-2, p. 27). He also assumed that cutlery was in the kitchen, and he did not know where it was. (*Id*., p. 27-28).

While Johnson could not recall whether Teresa threatened anyone with physical violence, the reports do not reflect that she did. (Johnson Depo., R. Doc. 39-2, p. 30). Nevertheless, Johnson decided to detain her because of the "natural course of progression of its [sic] just the way things were going." (*Id*.). Johnson was not comfortable with the way things were going, and he did not want anybody to be the victim of a battery or aggravated battery. (*Id*.). He detained her for her safety and everyone's safety. "[I]f she would have turned to any type of aggravated battery, that becomes a deadly force encounter." (*Id*.). No one suggested that Teresa move to another room though. (*Id*., p. 40). Johnson told Teresa that he was not arresting her but that he was just detaining her for her safety and for the safety of everyone there, or something to that effect. (*Id*., p. 41).

Erdey testified that she was restrained with cuffs because "[s]he was escalating, her whole situation, her whole demeanor. She started yelling more, started cussing more. She was just unpredictable." (Erdey Depo.,R. Doc. 52-6, p. 9). While Erdey admitted those things were not crimes, "[i]t could have been a safety issue," that is, "her everything, her whole demeanor." (*Id*.). Erdey said there was stuff she could have thrown, and there was a beer bottle there. (*Id*.).

"[T]here's plenty of things she could use as a weapon." (*Id.*).  In another part of the deposition, Erdey said she was a danger to herself or someone else because "[s]he escalated at one point in time pretty good" by starting to cuss her husband "very badly." (R. Doc. 62-5, p. 10).  "She was in a[n] area where there was plenty she could grab, throw, hit, whatever.  I don't know her temper.  I don't know how she acts.  I don't know her normal daily routine.  So at that point she definitely needed to be detained." (*Id.*, p. 10).  Johnson explained that he had a right to detain her because "She was unpredictable. She was irate.  We didn't know what she was going to do.  I tried to calm her down.  Her husband was trying to calm her down.  Nothing was working." (*Id.*, p. 14).

According to Johnson, he went to walk behind her and applied one handcuff. (R. Doc. 39-2, p. 43).  She was moving around at the time, going from leaning to hollering to being in Brian's face. (*Id.*, p. 43).  When Johnson tried to handcuff Teresa, she pulled away and screamed, "fuck you." (*Id.*).  When she pulled her hand back down, he executed a straight arm bar takedown. (*Id.*).  A straight arm bar takedown is a "pressure point control tactic where an officer places somebody in the prone handcuffing position." (*Id.*, p. 44).  Johnson did not remember if the maneuver was painful but stated that it is a "very quick maneuver." (*Id.*, p. 45).  Teresa was face down on the floor.  (*Id.*, p. 47).  With arm bar takedowns, the arms are usually vertical between Johnson's legs around his knee area so that he could apply pressure with his legs or with his arm as need be to gain pain compliance. (*Id.*, p. 46-47).  Here, Teresa refused to yield her left arm, so Sergeant Erdey stepped in. (*Id.*, p. 47).  Erdey secured the left arm, placed it in the handcuff, handed Johnson his cuff that was not attached to her arm, and Johnson cuffed the two cuffs together. (*Id.*).

Johnson testified that Teresa pulled away when Johnson tried to take her to the ground. (R. Doc. 39-2, p. 47-48). Johnson thinks she was trying to get away from him, but he did not know what she was doing. (*Id.*, p. 48). Johnson said Teresa hit her head on a wall that extended partially into the kitchen, and Johnson denied pushing her head into the wall intentionally. (*Id.*).

Teresa tells a different story. She said that, at some point while she was on the phone during her conversation with Ashleigh, she was spun around and her head hit the wall, and she was on the ground. (R. Doc. 52-9, p. 10). She said that it was a "split second" and that she did not see it coming. (*Id.*).

Gabrielle Stuart testified that both officers slammed Teresa against the little part of the wall that jutted out. (R. Doc. 52-10, p. 4).

Brian Golden testified that it "looked like a signal between them or something, but within a split second – I'm telling you it was completely fast and furious – he [Johnson] spun her around … smashed her head right into this wall." (R. Doc. 62-6, p. 2). Brian testified that he had his left hand on her wrist and his other hand on the back of the head; Johnson was angry and it looked to Brian like Johnson did it intentionally. (*Id.*, p. 3). After the takedown, Brian said there was blood everywhere. (R. Doc. 62-6., p. 5). Brian asked Johnson why he did this, and, while Brian did not remember exactly what Johnson said, Brian thought Johnson basically said he felt threatened because weapons were everywhere. (*Id.*, p. 6). Brian did not remember Erdey putting Teresa into the wall. (R. Doc. 53-5, p. 14).

There is also a dispute as to whether Teresa kicked anyone during the handcuffing. Sloan testified that Teresa kicked Johnson when she was down on the ground. (R. Doc. 52-7, p. 4). Johnson also said Teresa kicked him. (R. Doc. 53-6, p. 32). Brian said that he did not see any kicking. (R. Doc. 62-6, p.7).

### IX.    *Medical Care*

Teresa testified that, after she was "injured," she was cursing at everybody and saying "fuck you." (R. Doc. 52-9, p. 11). She also told the paramedics not to touch her "because at that point, I did not trust them." (*Id.*).

Erdey also testified that she refused medical treatment by Acadian. (R. Doc. 62-5, p.34-35). She was told that she could go to jail or to the hospital by one of the officers. (*Id.*, p. 35). Despite this, Erdey said that it had already been determined that she would go to jail. (*Id.*, p. 36). Erdey said one of them lied about this because she had already cussed, yelled, and become very angry, and they did not want things to escalate as they brought her down the stairs of her trailer to the car. (*Id.*).

### X.    *Coroner's Arrival and Teresa's Arrest*

In the interim between when Teresa was handcuffed and when the coroner arrived, things calmed down while Teresa sat on the couch; there were no complaints during that time. (B. Golden Depo., R. Doc. 53-5, p. 14). After the coroner arrived, he advised Johnson that Teresa did not appear to be suicidal. (Johnson Depo., R. Doc. 39-2, p. 52). Teresa testified that she cooperated with the coroner, though she was upset. (R. Doc. 52-9, p. 14). The coroner told her to go back to bed. (*Id.*).

Thereafter, Johnson placed Teresa under arrest and advised her of her Miranda rights. (Johnson Depo., R. Doc. 39-2, p.54). Teresa was charged with violating La. R.S.14:108, entitled "Resisting an officer," because she resisted being placed in handcuffs. (R. Doc. 39-2, p. 55). Johnson testified that she was not arrested for something else on this charge. (R. Doc. 53-6, p. 31-32).

She was also charged with violating La. R.S. 14:34.2, entitled "Battery of a police officer," because she allegedly kicked the officer. (Johnson Depo., R. Doc. 39-2, p. 56). The kicking of Officer Johnson was the only alleged battery she committed. (R. Doc. 53-6, p. 32). Erdey testified that the first crime he saw Teresa commit was the kicking. (*Id.*, p. 11).

Erdey testified that he probably had the authority to tell Johnson how to handle his call. (R. Doc. 62-5, p. 3). However, Erdey said that, as the supervisor, he could not tell Johnson that he couldn't make an arrest; if he had grounds to make an arrest, then that was his call. (R. Doc. 53-7, p. 5).

### XI.    *Post-Arrest Events*

At the jail, Johnson prepared a probable cause affidavit. (Johnson Depo., R. Doc. 52-5, p. 10). He completed the affidavit at the jail, printed it out, signed it, took it along with the property sheet and a booking sheet, left it on a desk, and made the booking deputy aware of it. (Johnson Depo., R. Doc. 62-3, p. 4). The purported probable cause affidavit indicates that it was notarized. (R. Doc. 52-11, p. 4).

Defendants contend that the judge found probable cause to continue the detention of Teresa. (R. Doc. 52-11, p. 4). However, the document establishing this alleged fact is unauthenticated. (R. Doc. 52-11, p. 4).

The evidence shows that the affidavit was not signed in the presence of a notary. Johnson did not know when the probable cause affidavit got notarized or who notarized it. (Johnson Depo., R. Doc. 62-3, p. 5). Erdey did not know whether the affidavit typically gets notarized and testified, "I don't know when or how the process goes." (R. Doc. 62-5, p. 21). Additionally, Plaintiffs submit evidence from another case in which the deputy said that the affidavits are usually not notarized the moment that officers sign them. (R. Doc. 62-2, p. 5-6).

Teresa attests to the fact that the District Attorney informed her that Deputy Johnson's charges against her would not be pursued. (R. Doc. 62-4, p.1).

## DISCUSSION

### I.      *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (citations and quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir.1991).

**II.     Cross Motion for Partial Summary Judgment … on Behalf of Deputy Brandon Johnson (Doc. 52) and Motion for Partial Summary Judgment on Behalf of Sergeant Steven Erdey (Doc. 53)**

### A.  Section 1983 Standard

When faced with a motion for summary judgment based on qualified immunity, courts must perform a two-pronged inquiry. *Tolan v. Cotton*¸ --- U.S. ----, 134 S.Ct. 1861, 1865, 118 L.Ed. 2d 895 (2014).  First, the Court determines "whether the facts, taken in the light most favorable to the party asserting the injury show the officer's conducted violated a federal right." *Id.* (citation, quotations, and alterations omitted).  Secondly, the Court asks "whether the right in question was 'clearly established' at the time of the violation."  *Id.* at 1866 (citing *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).

Concerning the second prong, the Supreme Court explained:

> Governmental actors are shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.  The salient question is whether the state of the law at the time of the incident provided fair warning to the defendants that their alleged conduct was unconstitutional.

*Id.* (citations, quotations, and alterations omitted).  The Eleventh Circuit has explained

> A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Maddox v. Stephens*, 727 F.3d 1109, 1121 (11th Cir. 2013) (citation omitted).

 "A defendant's acts are objectively reasonable unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the plaintiff's rights." *Velasquez v. Audirsch*, 574 F. App'x 476, 479 (5th Cir. 2014) (citation omitted).  Phrased another way, "If reasonable public officials could differ as to whether the

defendants' actions were lawful, the defendants are entitled to immunity." *Besson v. Webre*, 738 F.Supp.2d 657, 660-661 (E.D.La. 2010) (citing *Zarnow v. City of Wichita Falls, Tex.* 500 F.3d 401, 407-408 (5th Cir. 2007)).

"Once an official raises a qualified immunity defense, the plaintiff has the burden of rebutting it." *Id.* at 661 (citing *Zarnow.* 500 F.3d at 407). To do so, the plaintiff "must produce competent summary judgment evidence raising a genuine issue of material fact." *Id.* (citation omitted). "The qualified immunity determination should be made before trial as a matter of law *unless disputed facts are material to resolving whether the official acted in an objectively reasonable manner*." *Id.* (citing *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993)) (italics added).

In fact, the Supreme Court recently reaffirmed that, "in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 134 S.Ct. at 1863 (quotations and alteration omitted). Thus, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* at 1866. As the Supreme Court concluded in finding that the lower court had erred in failing to draw reasonable inferences in favor of the nonmoving party at the summary judgment stage, "[t]he witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." *Id.* at 1868.

### B. Unlawful Entry - Fourth Amendment

#### 1. Parties Arguments

Defendants argue their entry was not illegal because Brian did not tell the officers that they could not enter and because he never objected to their presence. Alternatively, Defendants

argue that, even if Brian did not consent to the entry, it was not unlawful because entries are allowed under the Fourth Amendment in cases of exigent circumstances. Relying on Fifth Circuit cases, Defendant argues that the plaintiff cannot point to existing precedent establishing that every reasonable officer would know that entry was illegal.

Plaintiffs respond that warrantless entries are presumptively illegal. Plaintiffs claim that there is an issue of fact as to whether Brian consented. Finally, even if Defendants had the right to enter, they were required to leave when the exigent circumstances ceased (that is, here, when they discovered that Teresa was in bed and not actively trying to kill herself).

### 2. Analysis

"Physical entry of the home is the chief evil against which the Fourth Amendment is directed. Pursuant to our Fourth Amendment law, warrantless searches of a person's home are presumptively unreasonable unless the person consents, or unless probable cause and exigent circumstances justify the search." *Gates v. Texas Dep't. of Protective and Regulatory Servs.*, 537 F.3d 404, 420 (5th Cir. 2008) (citations, quotations, and alterations omitted).[3] The Court finds that the Plaintiffs did not consent to the warrantless entry. However, Defendants Erdey and Johnson are entitled to qualified immunity because, even construing the facts in a light most favorable to the Plaintiffs, the law was not clearly established that the officers were not permitted to enter and remain in the Golden home under these circumstances Accordingly, the Defendants' motion on the unlawful entry claim is granted.

---

[3] *Gates* also addressed another exception to the warrant requirement – where there is a "special need" that is "divorced from the State's general interest in law enforcement." *Gates*, 537 F.3d at 420 (citations omitted). Because the parties did not raise this issue and argued only as to the consent and exigent circumstances exceptions, the Court declines to address the special need issue.

a. <u>Consent</u>

"This court determines whether consent was given based on the totality of the circumstances. The standard for measuring the scope of ... consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* (citations, quotations, and alterations omitted).  Further, the Fifth Circuit has held that "silence or passivity cannot form the basis for consent to enter," and "it is well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent." *Id.* at 420-421 (citations, quotations, and alterations omitted).

Construing the facts in a light most favorable to the Plaintiffs, Brian Golden did not consent to Erdey and Johnson entering his home.  When Erdy asked about Teresa, Brian said he would go get her, he "turned around, walked down the small hallway." (Doc. 52-4., p. 6).  Brian said that the "door swings back" automatically and the door closed on its own. (*Id.*).  A reasonable person would not have understood this exchange as allowing consent, particularly considering Brian's silence on the issue of Erdey entering.

b. <u>Exigent Circumstances and Qualified Immunity</u>

However, the Court finds that, even if there were a constitutional violation, the officers would be entitled to qualified immunity.  The Court is bound by *Rockwell v. Brown*, 664 F.3d 985 (5th Cir. 2011), the law in effect at the time of the incident.

In *Rockwell,* an individual was shot and killed after a scuffle in his home with the police. *Id.* at 988.  The individual had been "diagnosed as suicidal and had attempted suicide on more than one occasion, suffered from schizophrenia and bipolar disorder, and, at the time of the incident, had not taken his medication for several days." *Id.* at 994-995.  He had barricaded

himself in his room while pounding the walls, shaking the door, and hurling foul threats at the officers. *Id.* at 995.

The Fifth Circuit affirmed the lower court's granting of summary judgment on the claim that the officers unlawfully entered the deceased's bedroom. *Id.* at 994. The Fifth Circuit explained:

> Only a handful of courts of appeals and district courts have addressed whether the threat a suspect poses to himself may constitute an exigent circumstance; each of these courts concluded either (i) that the threat the suspect posed to himself *did* constitute an exigent circumstance or (ii) that the issue was not clearly established. None of these courts concluded that the threat the suspect posed to himself did not constitute an exigent circumstance. *Cf.* [*Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992)] (noting that the court (i.e., the Sixth Circuit) was not aware of "a single case indicating that an officer's attempt to rescue what the officers believes to be a suicidal person does not constitute exigent circumstances").

*Id.* at 995 (citations omitted). Thus, in light of this case law "and the overall dearth of binding Supreme Court and Fifth Circuit case law directly on point," the Fifth Circuit concluded that, "at the time of the incident … it was not clearly established that it was unreasonable for the officers to believe that the threat [the deceased] posed to himself constituted an exigent circumstance." *Id.* at 996.

Here, Plaintiffs are correct that there is no evidence establishing that the officers knew of the contents of the 911 call. Plaintiffs concede that the "deputies' welfare check on Teresa was prompted by a phone call from Teresa's sister … who called from Michigan to report that Teresa might be suicidal." (R. Doc. 39-1, p.2). Johnson mentions having Deana's number in his computer (R. Doc. 52-5, p. 6), having "conflicting stories" after talking to Teresa (R. Doc. 39-2, p. 49), and going outside "to call the sister" after seeing Teresa was not actively committing suicide (R. Doc. 52-5, p. 9). When he called Deana, he asked her about the conversation she and Theresa had earlier that day. (R. Doc. 42-5, p. 9). Aside from this, there is no evidence as to the

substance of the dispatch report.  Thus, construing the facts in a light most favorable to the

Plaintiffs, Johnson and Erdey knew only that Teresa's sister had called and told the police that

Teresa was suicidal based on a conversation the two had earlier that day .

Nevertheless, based on *Rockwell*, the law was not clearly established at the time of the

incident such that it was unreasonable for Johnson and Erdey to believe that the threat Teresa

posed to herself constituted an exigent circumstance.  *See also Velasquez v. Audirsch*, 574 F.

App'x 476, 481 (5th Cir. 2014) (unpublished) ("[T]he ultimate question is not whether the

Officers' actions were reasonable under the Fourth Amendment; the question is whether *the law*

*at the time of the Officers' entry into the* [Plaintiffs'] *home clearly established that their actions*

*were unreasonable*.").[4]  Under *Rockwell*, summary judgment is warranted.

For similar reasons, the Court finds that even if the Defendants' continued presence in the

home after being told to leave was a constitutional violation, based on *Rockwell*, the law was not

so clearly established on the issue of entry that the Defendants would lose their qualified

immunity.   Plaintiffs have pointed to no case law indicating otherwise specifically in the mental

health arena.  Accordingly, the claims for unlawful entry are dismissed.

### C.  False Arrest/Unlawful Seizure – Fourth Amendment

#### 1. Parties' Arguments

Defendants argue that there is a distinction between arrests and seizures and that the

officer's conduct is evaluated under an objective reasonableness standard.  They contend that the

---

[4] The Court notes that, after the events of this suit, the Fifth Circuit decided *Rice v. ReliaStar Life Insurance Co.*, 770 F.3d 1122 (5th Cir. 2014), which held that "the threat an individual poses to himself may create an exigency that makes the needs of law enforcement so compelling that a warrantless entry is objectively reasonable under the Fourth Amendment." *Id.* at 1132.  The Fifth Circuit noted that, "courts must still determine whether the actions of the law enforcement officer who entered without a warrant were objectively reasonable" by ensuring "that, at the time the officer acted, there was reliable information of an 'urgent, ongoing emergency.'" *Id.*  Since qualified immunity is determined by the law in effect at the time of the incident, the Court cannot consider this for the present motion.

*Terry* standard of short detentions is applicable and just requires reasonable suspicion. Further, they claim that using handcuffs does not transform an investigative stop into a full arrest. Defendants argue Teresa was lawfully detained in handcuffs pending their investigation and that there was probable cause to arrest her. According to Defendants, every reasonable officer would not know their conduct was illegal, and there was arguable probable cause for the arrest. Finally, Defendants claim that an independent intermediary (i.e., the judge at the state district court) determined that there was probable cause to keep Teresa in custody, so that "breaks the chain" of liability for a false arrest claim.

Plaintiffs respond that the "breaks the chain" analysis does not apply because Johnson did not have his probable cause "affidavit" signed under oath in the presence of a notary. Further, Plaintiff claims a *Terry* stop can only occur in a public place and cannot occur when the person is not suspected of a crime.

Defendants respond that Plaintiffs failed to address why probable cause existed for the detention and arrest of Teresa. They cite to a detention in a Seventh Circuit case involving a detention in a private home when there was a domestic dispute. Further, Defendants state that, at a minimum, they are entitled to qualified immunity because not every reasonable officer would know that the conduct was illegal. They further claim that there is no legal support for the proposition that an improperly notarized affidavit alone defeats the "breaks the chain" doctrine and that, under existing law, Plaintiffs must show that the officer knowingly presented false information in reckless disregard for the truth.

### 2. Analysis

The Court finds that contested issues of material fact preclude the entry of summary judgment in favor of the Defendants on the unlawful seizure claim. Summary judgment is

further denied as to the claim against Johnson for a false arrest.  But summary judgment is granted as to the false arrest claim against Erdey.

a.   Mental Health Seizure

First, the Court finds that the officers detained Teresa for a mental health evaluation. This mental health seizure began when the officers entered Teresa's home, continued during her questioning, reached a crescendo when she was handcuffed, and ended when the coroner concluded that she was not suicidal.

"The probable cause standard applies in the context of a seizure of the mentally ill." *Cantrell v. City of Murphy*, 666 F.3d 911, 923 n. 8 (5th  Cir. 2012).  "The application of the probable cause standard in this context is further supported by the Supreme Court's decision in *Dunaway v. New York* 442 U.S. 200, 214, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), which stands for the general proposition that a Fourth Amendment seizure is reasonable only if supported by probable cause." *Id.*  "[P]robable cause exists where the facts and circumstances within the officer's knowledge at the time of the seizure are sufficient for a reasonable person to conclude that an individual is mentally ill and poses a substantial risk of serious harm." *Id. See also Martinez v. Smith*, 200 F.3d 816, at *1 (5th Cir. 1999) (unpublished) ("the relevant test [for seizing someone for psychological evaluation] is whether a reasonable officer would, under all of the circumstances, have had probable cause to believe the plaintiff was dangerous.").  When determining probable cause, Courts examine whether the officers had probable cause to detain the individual under the relevant state law.  *See Cantrel*, 666 F.3d at 923; *Martinez*, 200 F.3d at *2.

But strict adherence to every minor detail of state law is not required.  *See Sullivan v. County of Hunt, Texas*, 106 F. App'x 215, 219, 2004 WL 1636919 (5th Cir. 2004).  In *Sullivan*,

the Fifth Circuit reversed the district court's denial of the defendant's motion for summary judgment and found that the officer was still entitled to qualified immunity despite violations of the details of Texas' health and safety code. For instance, the allegedly suicidal individual was taken to the sheriff's office rather than to the hospital. *Id.* In explaining its holding, the Fifth Circuit stated:

> So long as [the officer] did not violate rights reserved to [the plaintiff] under the United States Constitution, [the officer] is entitled to qualified immunity on his federal claims. The important procedural steps Texas requires for detention were complied with and the procedural steps taken complied with rights guaranteed to [the plaintiff] by the U.S. Constitution.

*Id.* Thus, the Court should look to whether "important procedural steps" in the state law were followed.

The Court finds this probable cause standard applicable despite the fact that, in *Cantrell*, the Fifth Circuit applied it in the context of taking an individual from the home to the police station. Johnson testified that Teresa was not free to leave her home upon his arrival. (R. Doc. 39-2, p. 54). In *Cantrell*, the officers brought the plaintiff to the evaluation; here, the officers brought the evaluation to the plaintiff. There was a substantially similar restriction of freedom as taking Teresa into protective custody. Accordingly, the probable cause standard applies.

The relevant state law is La. Rev. Stat. § 28:53(L), which provides in part:

> *(1) A peace officer or a peace officer accompanied by an emergency medical service trained technician may take a person into protective custody and transport him to a treatment facility for a medical evaluation when, as a result of his personal observation, the peace officer or emergency medical service technician has reasonable grounds to believe the person is a proper subject for involuntary admission to a treatment facility because the person is acting in a manner dangerous to himself or dangerous to others, is gravely disabled, and is in need of immediate hospitalization to protect such a person or others from physical harm.* The person may only be transported to one of the following*:*
>     (a) A community mental health center.
>     (b) A public or private general hospital.
>     (c) A public or private mental hospital.

(d) A detoxification center.
(e) A substance abuse clinic.
(f) A substance abuse in-patient facility.

(2) Upon arrival at the treatment facility, the escorting peace officer shall then be relieved of any further responsibility and the person shall be immediately examined by a physician, preferably a psychiatrist, who shall determine if the person shall be voluntarily admitted, admitted by emergency certificate, or discharged.

For the same reasons as articulated above, under these circumstances, La. Rev. Stat. § 28:53(L)(1) is applicable to this case despite the fact that Teresa was not "transport[ed] to a treatment facility." Again, practically speaking, her freedom was restricted in the same way as though she were transported to a facility. Under these circumstances, this statute applies.[5]

The plain language of La. Rev. Stat. § 28:53(L)(1) has certain requirements. Specifically, the officer must (1) base his decision to bring the person into protective custody on "personal observation," and (2) have reasonable grounds to believe that the subject for involuntary admission because (a) the person is acting in a manner "dangerous to himself" or "dangerous to others," (b) is "gravely disabled," and (c) the person is in need of immediate hospitalization to protect himself or others from physical harm. Many of the applicable terms are defined in La. Rev. Stat. § 28:2, which provides in part:

---

[5] Plaintiff contends that the relevant law is La. Rev. Stat. § 28:53.2(A), which provides in pertinent part:

*Any parish coroner or judge of a court of competent jurisdiction may order a person to be taken into protective custody and transported to a treatment facility or the office of the coroner for immediate examination* when a peace officer or other credible person executes a statement under private signature specifying that, to the best of his knowledge and belief, the person is mentally ill or suffering from substance abuse and is in need of immediate treatment to protect the person or others from physical harm.

(emphasis added). Section 28:53.2(G) also provides a procedure to enter a dwelling and to restrain and transport an individual for protective custody and examination if the coroner or his support staff is "refused or obstructed from admittance." Here, there is no evidence the parish coroner ordered that Teresa be taken into custody, only that the coroner was dispatched to evaluate her. Thus, this statute is inapplicable. Further, La. Rev. Stat. 28:53(L) is the more specific statute dealing with police officers. Accordingly, the Court rejects Plaintiffs' arguments.

(3) "Dangerous to others" means the condition of a person whose behavior or significant threats support a reasonable expectation that there is a substantial risk that he will inflict physical harm upon another person in the near future.

(4) "Dangerous to self" means the condition of a person whose behavior, significant threats or inaction supports a reasonable expectation that there is a substantial risk that he will inflict physical or severe emotional harm upon his own person.
…
(10) "Gravely disabled" means the condition of a person who is unable to provide for his own basic physical needs, such as essential food, clothing, medical care, and shelter, as a result of serious mental illness or substance abuse and is unable to survive safely in freedom or protect himself from serious harm; the term also includes incapacitation by alcohol, which means the condition of a person who, as a result of the use of alcohol, is unconscious or whose judgment is otherwise so impaired that he is incapable of realizing and making a rational decision with respect to his need for treatment.

Thus, Louisiana law appears to be substantially similar, though more detailed, than the Fourth Amendment standard articulated by the Fifth Circuit.

Here, despite Defendants' contentions, there are a considerable number of disputed facts. These include:

(1) How drunk was Teresa?  Contrary to the Defendants' account, Teresa's husband said she just had a "bit to drink" and that, when Johnson allegedly threw her head into the wall during the handcuffing, Teresa was no longer intoxicated (R. Doc. 52-4, p. 3; R. Doc. 62-6, p.3) ;

(2) Was Teresa cooperating? While others say Teresa was not cooperating, she testified that she was cooperating and not belligerent, though she was assertive (R. Doc. 52-9, p. 6);

(3) What did Teresa say on the phone? Defendants say she was just asking for help, but the Plaintiffs say directly or imply that she was asking for a lawyer (R. Doc. 52-9, p. 8; R. Doc. 52-4, p. 13); and

(4) Did Teresa pose a threat?  Different inferences can be drawn from the facts presented. Johnson noted the presence of the beer bottle, but he admitted that no report showed she threatened anyone with violence. (R. Doc. 39-2, p. 30).  There is no evidence in the record that she threatened anyone with the beer bottle either.  Further, Deana reported her as being violent, but a) other witnesses said Deana could not be believed (R. Doc. 39-2, p. 24) and b) more importantly, Deana's statements are irrelevant for state law purposes given Louisiana's requirement for "personal observation."

Such facts are all directly relevant in determining whether the parties complied with the Fourth Amendment standard set forth in *Martinez* and *Cantrell*. Further, these facts are also directly relevant in assessing Johnson and Erdey's compliance with "important" aspects of Louisiana state law, particularly the requirements of grave disability and Teresa being a danger to herself and others. Thus, there are genuine issues of material fact as to whether Johnson and Erdey had probable cause to detain Teresa for a mental health evaluation.

Similarly, the Court also cannot make a determination on qualified immunity given these issues of material fact. *Cantrell*, *Martinez*, and *Sullivan* were each decided before the events of this lawsuit. Further, La. Rev. Stat. § 28:53(L)(1) and its definitions appears to have been substantially in effect for decades. See 1977 La. Acts 1932; 1978 La. Acts 2057; 1979 La. Acts. 2160, 2162. Thus, the law is clearly established that an individual has a right to be free from a mental health detention unless he is mentally ill and poses a substantial risk of serious harm to others. *See Maddox*, 727 F.3d at 1121 ("A right may be clearly established for qualified immunity purposes in one of three ways … (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right."). However, given the numerous issues of material fact outlined above, the Court cannot determine as a matter of law whether, under all the circumstances, a reasonable officer could have believed that the seizure was lawful in light of this clearly established law.

As this Court explained in the *Cox v. Columbia Casualty Co.*, No. CIV.A. 12-306-SDD, 2014 WL 29456, at *9 (M.D. La. Jan. 3, 2014), which also denied summary judgment to an officer seeking qualified immunity, "A defendant's claim to summary judgment on the qualified immunity issue must be denied where, as in this case, '[d]ivergent versions of what happened have been offered by [the parties].'" *Id.* at *9 (quoting *Johnston v. City of Houston*, 14 F.3d

1056, 1061 (5th Cir. 1994)).  "[T]he district court cannot draw conclusions of law from disputed

facts at the summary judgment phase."  *Id.* (citing *Goodson v. City of Corpus Christi*, 202 F.3d

730, 739 (5th Cir. 2000)).  The *Cox* court continued:

> the reasonableness of an officer's conduct under the Fourth Amendment is often a
> question that requires the input of a jury.  This is not only because the jury must
> resolve disputed fact issues but also because the use of juries in such cases
> strengthens our understanding of Fourth Amendment reasonableness.
>
> …
>
> [I]n those cases where the officer's conduct is less clear and an assessment of
> reasonableness mandates a number of factual inferences, the case falls within the
> province of a jury. Thus, when determining whether the officer's alleged conduct
> violated the constitutional right to be free from unreasonable seizures, we must
> remain mindful of the role that the jury can play in this determination

*Id.* at *10 (quoting *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 411 (5th Cir. 2009)).  Thus, as in

*Cox*, because assessing the officers' conduct in light of clearly established law would warrant a

number of factual inferences, the Court denies the claim of qualified immunity.

Additionally, the Court finds *Cantrell*, *Martinez*, and *Sullivan* clearly distinguishable.  In

*Cantrell*, the Court found that a reasonable officer would have had probable cause to take the

plaintiff into protective custody when she made suicidal comments in her home in front of

officers after the tragic death of her son.  666 F.3d at 916, 923.  Here, there was no such tragic

event, and Teresa never made suicidal statements to the officers.

*Martinez* is equally distinguishable.  In *Martinez*, the Court explained that a "reasonable

officer could have believed that [the plaintiff] posed a danger to herself" when (1) "[s]omeone

familiar" with the plaintiff "stated recent contact reported that she was suicidal; (2) after insisting

she was fine, the plaintiff noted that she had a disagreement with her ex-husband; (3) the plaintiff

attempted to close the door on the officers before they could talk further; and (4) despite

claiming that she was rational, the plaintiff admitted that she did things that could have seemed

odd to reasonable officers, such as sitting on the floor and running from the officers. 200 F.3d 816, at *1. Here, there was no triggering event like a disagreement with an ex-husband. Unlike the *Martinez* plaintiff, who shut the door on the officers, Teresa said here that she was cooperating with the officers. (R. Doc. 52-9, p. 11). Finally, any irrational behavior displayed by Teresa could easily be attributed to Johnson "aggressively questioning" and "intimidating" Teresa. (B. Golden Depo., R. Doc. 52-4, p. 9-10).

 *Sullivan* also involved a more extreme situation. In *Sullivan*, the Court found that a reasonable officer in the defendants' position would have had probable cause to believe that the Plaintiff was a suicide risk for several reasons in addition to reports from family members, including the facts that (1) the day before the seizure, the plaintiff discovered that his fiancé had shot herself with a revolver in his home; (2) the officer knew the plaintiff, his relationship with his fiancé, and his distress over the "tragic death;" (3) the officers tried for about two hours to reach the plaintiff by telephone before the seizure; and (4) the plaintiff's physician expressed concerns to another officer that the plaintiff was taking medication for depression, and the physician told the other officer that he was concerned that the plaintiff could be suicidal. 106 F. App'x at 217-218. Thus, *Sullivan* too is far more extreme than the case at bar.

 In sum, *Cantrell*, *Martinez*, and *Sullivan* are all clearly distinguishable. Construing the facts in a light most favorable to the Plaintiffs, Johnson and Erdey were objectively unreasonable in believing that their conduct was lawful in light of the principle from these cases that individuals can only be seized for mental health evaluations if there is probable cause to believe that "an individual is mentally ill and poses a substantial risk of serious harm." *Cantrell*, 666 F.3d at 923.

Finally, the Court further finds no inconsistency between its ruling that no issue of material fact precludes entry of summary judgment on the unlawful entry claim and its ruling that issues of fact preclude the entry of summary judgment on the unlawful seizure claim. The Fifth Circuit expressly stated that law in effect at the time of the incident *was not* clearly established that the officer's entry was unlawful. *See Rockwell*, 664 F.3d at 996. Thus, the officers were entitled to qualified immunity, and summary judgment was appropriate on this claim. *Id.* Conversely, based on *Cantrell*, *Martinez*, and *Sullivan* and the relevant state law above, it *was* clearly established that officers could not seize someone for a mental health evaluation absent probable cause that the individual is mentally ill and poses a substantial risk of serious harm. The issue then becomes whether a reasonable officer could have believed that the seizure in this case was lawful in light of that clearly established law. Because the Court cannot make this determination given the numerous factual disputes, summary judgment is inappropriate for the unlawful seizure claim.

  b.  <u>Arrest - Generally</u>

In *Besson*, the Eastern District of Louisiana provided a concise summary of the law on wrongful arrest:

> [T]o prevail on a false arrest claim under section 1983, the plaintiff must prove that the defendants lacked probable cause to arrest [her].
>
> The probable cause standard deals with the considerations that cause reasonable people, not legal technicians, to act. Probable cause exists for a warrantless arrest when the totality of the facts and circumstances within a police officer's knowledge at the moment of the arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense. Probable cause is an objective determination that does not depend on the officer's subjective beliefs. Rather, it depends on the facts known to the officer at the time of the arrest. Probable cause requires only a probability of criminal activity, not proof beyond a reasonable doubt.
>
> Even if an officer erred in concluding that probable cause existed for an arrest,

he is entitled to qualified immunity if his decision was reasonable, albeit mistaken. Thus, if a reasonable officer could have believed that the arrest was lawfully based on probable cause, the officer retains qualified immunity. In that event, the officer is entitled to summary judgment on qualified immunity grounds even if the officer violated an individual's Fourth Amendment rights.

…

Claims for false arrest focus on the validity of the arrest, not on the validity of each individual charge made during the course of the arrest. Thus, if there was probable cause for any of the charges, then the arrest was properly supported by probable cause, and the false arrest claim fails.

*Id.*, 738 F.Supp.2d  at 661-662 (citations and quotations omitted).

Because Erdey did not arrest Teresa, he cannot be liable for the false arrest claim.  *See Kitchen v. Dallas County, Tex.*, 759 F.3d 468, 481 (5th Cir. 2014) ("Defendant-Appellees correctly observe that bystander liability arises under [*Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995)], only where the plaintiff can allege and prove 'another officer's use of excessive force.").  Accordingly, while the claim for unlawful mental health seizure against Erdey survives, the claim against him for false arrest is dismissed.

### c.  Arrest for "Battery of a police officer"

The Court will thus address the false arrest claim as to Johnson.  There seems to be no question that there is an issue of fact as to the battery.  Teresa was arrested for the battery solely because she allegedly kicked Johnson.  (R. Doc. 53-6, p. 32).  Brian stated that he did not see Teresa kick Johnson (R. Doc. 62-6, p. 7) while the officers and Sloan claim that she did (R. Doc. 52-7, p.4; R. Doc. 53-6, p. 32).  Thus, construing the arrest in a light most favorable to Plaintiffs, there was no kicking, and the arrest was wrongful.

On the issue of qualified immunity for a false arrest, the "right to be free from false arrest was clearly established at the time of the incident." *Besson*, 738 F.Supp.2d at 666.  The same reasoning from *Cox* applies to the determination of whether there was qualified immunity for the

arrest for battery; the Court cannot make a conclusion of law from these disputed material facts, particularly when, construing the facts in a light most favorable to the Plaintiffs, it would be objectively unreasonable for Johnson to believe that he had probable cause to arrest Teresa when Teresa did not kick him.

### d. Arrest for "Resisting an officer"

As stated above, if there is probable cause for the resisting arrest charge, there is probable cause for the entire arrest. Teresa was charged with violating La. R.S.14:108, resisting an officer, because she resisted being placed in handcuffs. (R. Doc. 39-2, p. 55). She was not arrested for anything else. (R. Doc. 53-6, p. 31-32).

La. R.S. 14:108(A) provides in part:

> Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity.

The key issue here is thus whether the detention was "lawful." For example, in *State v. McCoy*, 546 So.2d 240 (La.App. 2 Cir. 1989), the court held that "Defendant's acts of refusing to place his hands on the police car and 'stiffening' when they attempted to handcuff him constituted reasonable resistance of an unlawful arrest." *Id.* at 244. The *McCoy* court explained, "A person has a right to resist an unlawful arrest and can use reasonable force in doing so." *Id.* (citing *State v. Lindsay*, 388 So.2d 781 (La.1980)).

As explained above, there are issues of fact which preclude a determination of whether Teresa's detention was lawful, which means there are disputed issues of material fact as to whether Johnson's arrest was improper. Further, while the right to be free from wrongful

detention and arrest is well established, disputed issues of material fact preclude granting the

Defendants summary judgment on the qualified immunity claim.

e.   <u>Arrest – Breaks the Chain Doctrine</u>

The next issue is whether the district judge's alleged finding of probable cause "breaks

the chain" of the false arrest claim and warrants a dismissal of this cause of action.  Johnson

claims that it does.  Plaintiffs, on the other hand, submitted evidence that the Defendant Johnson

did not have his affidavit notarized before a notary. (R. Doc. 62-3, p. 4).  He claims it is thus

invalid.  Plaintiff contends that the "breaks the chain" doctrine is inapplicable because the

affidavit was not properly notarized.

The Court need not decide the difficult question of whether the "breaks the chain"

doctrine applies in this case because there is no proper summary judgment evidence in the record

establishing the finding of probable cause by the trial judge.  This Court has explained:

> "To be considered by the court, 'documents must be authenticated by and
> attached to an affidavit that meets the requirements of Rule 56(e) and the affiant
> must be a person through whom the exhibits could be admitted into evidence.'...
> A document which lacks a proper foundation to authenticate it cannot be used to
> support a motion for summary judgment." *Hal Roach Studios, Inc. v. Richard
> Feiner and Co., Inc* ., 896 F.2d 1542 (9th Cir.1989). *See also  Martin v. John W.
> Stone Oil Distributor, Inc*., 819 F.2d 547 (5th Cir.1987) ("Unsworn documents
> are ... not appropriate for consideration [on motion for summary judgment]");
> *Moffett v. Jones County*, 2009 WL 1515119 (S.D. Miss., June 1, 2009) ("The
> records are not certified ... nor sworn in any way, thus they are inadmissible");
> *Rizzuto v. Allstate Ins. Co*., 2009 WL 1158677 (E.D. La., April 27, 2009) (same);
> 10A Charles Alan Wright, et al., Federal Practice & Procedure § 2722 (3rd
> ed.1998).

*Hall v. Johnson*, No. CIV.A. 12-00099-BAJ, 2013 WL 870230, at *1 (M.D. La. Mar. 7, 2013).

Further, in *Williams v. Bank of New York Mellon*, No. 3:09-CV-1622-BH, 2010 WL 3359461, at

*4 (N.D. Tex. Aug. 23, 2010), the court explained:

> Under Fed.R.Evid. 901(a), authentication or identification is a condition
> precedent to admissibility. While Rule 901 does not require conclusive proof of

authenticity, it requires at least some evidence sufficient to support a finding that the evidence in question is what the proponent claims it to be. *See United States v. Arce,* 997 F.2d 1123, 1128 (5th Cir.1993). For public records, evidence that a writing is from the public office where items of such nature are kept is sufficient to find authentication. Fed.R.Evid. 901(b)(7). A public record is also admissible if it is self-authenticating, for example, when it constitutes a public document under seal or is certified by its custodian or other qualified person. *See* Fed.R.Evid. 902.

Here, there is no evidence that the document submitted to prove the finding of probable cause is from a public office, and it contains neither seal nor certification. Accordingly, the Court will not consider the document.

Consequently, there is no competent summary judgment evidence that the district judge found probable cause, so the Court rejects the Defendants' argument that the "breaks the chain" doctrine applies. Summary judgment as to the false arrest claim is denied.

### D. False Arrest and False Imprisonment Claim – State Law

In *Cook v. Perkins*, No. CIV.A. 12-258-SCR, 2013 WL 5720327 (M.D. La. Oct. 21, 2013) *aff'd sub nom. Cook v. Graves*, 575 F. App'x 505 (5th Cir. 2014), the Court explained:

> Under Louisiana law false arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority. Simply stated, it is a restraint without the color of legal authority. When an arrest is made without a warrant, the plaintiff must prove the officer lacked probable cause for the arrest.

*Id.* at *5 (citations omitted). Thus, this claim hinges on the above findings of probable cause.

As to Johnson, because there are genuine issues of material fact as to whether there was probable cause for the mental health seizure and arrest, there are issues of fact as to these state law claims. Accordingly, Johnson's motion is denied.

Erdey did not arrest Teresa, so the false arrest claim against him is dismissed. However, there is an issue of fact as to whether he had probable cause to detain her for the mental health seizure. Thus, the false imprisonment claim against Erdey is denied.

### E. Excessive Force – Fourth Amendment

#### *1. Claim Against Officer Johnson*

"*[A]ll* claims that law enforcement officers have used excessive force … in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Bazan ex rel. Bazan v. Hidalgo County,* 246 F.3d 481, 487 (5th Cir. 2001) (citation omitted) (emphasis in original). The Fifth Circuit has held:

> It is clearly established law in this circuit that in order to state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable.

*Id.* (citations omitted). "Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (citation omitted).

"To satisfy the injury requirement, 'it is not necessary for the jury to find that the victim suffered 'significant injury,'' but the plaintiff must prove that he sustained "'some' injury beyond ' *de minimis*' injury." *United States v. Diaz*, 498 F. App'x 408, 412 (5th Cir. 2012) (quoting *United States v. Brugman*, 364 F.3d 613, 618 (5th Cir. 2004)). When determining whether a Fourth Amendment injury is more than *de minimis*, the Court must "look to the context in which that force was deployed[ ] ... [as] related to the amount of force that is constitutionally permissible under the circumstances. What constitutes an injury in an excessive force claim is therefore subjective—it is defined entirely by the context in which the injury arises." *Id.* (citing *Brugman*, 364 F.3d at 618). Additionally, "'[p]hysical pain' may, depending

on the context in which the injury arose, constitute 'bodily injury' sufficient to overcome the *de minimis* threshold." *Id.*

Here, it is clear that Teresa suffered more than a *de minimis* injury. She submits proof that her head was slammed into the wall and that blood was everywhere. (R. Doc. 62-6., p. 5). This requirement is thus met.

As to the second element, construing the facts in a light most favorable to the Plaintiffs, the injury resulted directly and only from the use of force that was clearly excessive to the need. Brian said that his wife was not belligerent and said that she was only "perhaps" uncooperative. (R. Doc. 52-4, p. 9). Teresa stated that she was neither uncooperative nor belligerent, though she was assertive. (R. Doc. 52-9, p. 6). While she admitted to yelling and swearing at her husband, she said she was cooperating with the officers. (*Id.*, p. 7, 11). Further, Johnson admitted that the reports do not reflect that Teresa threatened anyone and said he could not remember if she had. (R. Doc. 39-2, p. 30). There is no evidence in the record that she threatened anyone with a beer bottle or with any other weapon. Drawing inferences in the Plaintiffs' favor, this prong is thus satisfied.

Plaintiffs have also demonstrated that the use of force was objectively unreasonable. "Factors to consider include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Deville*, 567 F.3d at 167 (citation and quotations omitted). Further, the Supreme Court has cautioned, "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865 (1989). The Supreme Court has further instructed:

As in other Fourth Amendment contexts … the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Id.* (citations omitted).

Again construing the facts in a light most favorable to the Plaintiffs, the Court finds that the Defendant's conduct was objectively unreasonable. Teresa did not commit a crime at the time her head was slammed into the wall. (See R. Doc. 39-2, p. 55; R. Doc. 53-6, p. 32). According to Teresa, she was on the phone at her head was smashed into the wall, and she was trying to obtain legal assistance. (R. Doc. 52-9, p. 10). Teresa also said that she was cooperating with the authorities and was not belligerent. (R. Doc. 52-9, p. 6, 11). While the prospect of suicide is serious generally, she was not actively committing suicide when the police entered the Plaintiffs' home, and there is no evidence that she was doing so at the time of the use of force. (See R. Doc. 39-2, p. 13-15). Further, as stated above, no report reflects the fact that Teresa threatened anyone, (R. Doc. 39-2, p. 30). Although the officer was told by Deana that Teresa had once attempted to cut herself with a beer bottle, Johnson was also told by Brian and Teresa that Deana was not credible. (R. Doc. 39-2, p. 24). And there is no evidence in the record that she threatened anyone with the beer bottle. Moreover, according to Teresa and Brian, at the moment Johnson drove her head into the wall, Teresa was on the phone, not actively resisting arrest or evading the officers, and was sober. (R. Doc. 52-9, p. 10; R. Doc. 62-6, p. 3). Additionally, there is a question of fact as to whether Teresa's seizure was lawful and thus whether her resistance was permissible. In sum, there is a genuine issue of material fact as to whether Johnson's use of force was objectively reasonable.

Finally, concerning qualified immunity, the Eastern District recently explained:

> [I]t is a clearly established right that an individual has the right to be free from the use of excessive force during a detainment. More specifically, the law was clearly established, and thus [the officer] should have known, that when one is not resisting arrest, attempting to escape, or otherwise posing a threat at the time of the alleged use of force, 'slamming' one into walls and thereby causing injuries constitutes an excessive use of force.

*Curran v. Aleshire* --- F.Supp.3d ----, 2014 WL 7185403, at *8 (E.D.La. 2014), *appeal filed*, NO. 15-30027 (citing *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008)) (denying summary judgment as to federal excessive force claim for an incident arising on September 24, 2008). Plaintiffs have submitted sufficient evidence to create a material issue of disputed fact as to qualified immunity as well. Accordingly, summary judgment is denied.

The Court finds *Martinez* distinguishable on the excessive force claim. In *Martinez*, the plaintiff ran from the deputies immediately before being handcuffed, and the deputies were told that she had a gun in the house. 200 F.3d 816, at *2. The Court found no constitutional violation in the officer's handcuffing and grabbing the plaintiff. Further, in finding that the officers were entitled to qualified immunity, the Court explained that "the officers were confronted with an uncooperative, possibly suicidal person who might have access to a firearm." *Id.*

Here, unlike *Martinez*, Johnson slammed Teresa's head into the wall in addition to merely handcuffing her. Teresa testified that she was cooperating. (R. Doc. 52-9, p. 11). Further, having a gun in the house is a significantly greater threat than merely a beer bottle, even if Deana had advised Johnson that the beer bottle was potentially dangerous in Teresa's hands. A beer bottle is a common, everyday item likely found in most households. Thus, the Court finds that, for qualified immunity purposes, this case more properly falls under the *Curran* line of case law, and the law was clearly established.

Finally, summary judgment is inappropriate given the contested issues of fact. As the *Cox* court explained, "with the backdrop of these highly contested [material] facts, the Court is unable [to] make a summary judgment that [the officer's] conduct was objectively reasonable in light of clearly established law." 2014 WL 29456, at *9. Johnson's motion for summary judgment on this issue is denied.

### *2. Excessive Force Claim Against Erdey*

Defendant also seeks dismissal of the excessive force claims against Erdey. Plaintiff responds that Erdey is liable both as a bystander and for being personally involved in the constitutional deprivation.

Under *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995), an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983. In *Hale*, the Court found an issue of material fact as to whether the deputy sheriff "had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Id.*

The Court finds that there is an issue of material fact precluding summary judgment in favor of Erdey. On the one hand, both Brian and Teresa said Johnson's ramming her head into the wall occurred in a "split second," and Brian said it was "completely fast and furious." However, construing the facts in a light most favorable to Plaintiffs, Brian also said that, before the act occurred, it "looked like [there was] a signal between them or something," (R. Doc. 62-6, p. 2) and that the head-striking occurred within a split-second thereafter. A reasonable juror could infer from this fact that Erdey had a reasonable opportunity to prevent the head-striking.

For the same reason, there is an issue of fact as to whether Erdey, as Johnson's supervisor, was personally involved in the accident. As the Fifth Circuit explained in *Thompkins v. Belt*, 828 F.2d 298, 303-304 (5th Cir. 1987)

> Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability. However, a supervisor may be held liable if there exists either (1) his personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.

A reasonable jury could find that the signal between Erdey and Johnson amounted to participation by Erdey in the act of slamming Teresa's head into the wall, or at the very least that there was a causal connection between Erdey's signal and Johnson's slamming.

As set out above, the law in this area is clearly established, and, assuming Plaintiffs' account as true, it was objectively unreasonable for Erdey to believe his conduct was lawful in light of clearly established law. Accordingly, summary judgment as to the excessive force claim against Erdey is denied.

### F. Assault and Battery – State Law

This Court has recognized that

> To prevail on a claim of battery under Louisiana law, a plaintiff must prove three elements: (1) a subjective intent by defendant to inflict a harmful or offensive contact without plaintiff's consent; (2) unwelcome contact without consent; and (3) a harmful or offensive touching. *Caudle v. Betts,* 512 So.2d 389, 391 (La.1987)."The intent with which tort liability is concerned is not necessarily a hostile intent or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interests of another in a way that the law forbids. The defendant may be liable although ... seeking the plaintiff's own good." *Id.*

*Simmons v. Johnson*, No. CIVA 06-325-JVP-CN, 2008 WL 3976928, at *5 (M.D. La. Aug. 22, 2008). Additionally, "[a]n assault takes place when the defendant intentionally places plaintiff in imminent apprehension of a harmful or offensive contact when the defendant has the apparent

ability to carry out the threatened conduct at the time." *Id.* (citing 18 La. Civ. L. Treatise, Civil Jury Instructions § 14, 04).

Further, "[p]olice officers …  may legitimately employ reasonable force to perform their duties and preserve order. Their use of force is privileged so long as the force used is not unreasonable or excessive." *Id.* (citations omitted).  "The court must evaluate the officer's actions against those of ordinary, prudent and reasonable men placed in the same position as the officers and with the same knowledge. The degree of force employed is a factual issue[.]" *Ross v. City of New Orleans*, 2000-1879 (La. App. 4 Cir. 11/21/01), 808 So. 2d 751, 758-59.  Further Louisiana law recognizes that:

> In determining whether the force used by a police officer was unreasonable under the circumstances, factors to be considered are: (1) the known character of the arrestee, (2) the risks and dangers faced by the officers, (3) the nature of the offense involved, (4) the chance of the arrestee's escape if the particular means are not employed, (5) the existence of alternative methods of arrest, (6) the physical size, strength, and weaponry of the officers as compared to the arrestee, and (7) the exigency of the moment.

*Id.* at 759 (citations omitted).

For the reasons articulated above in the excessive force analysis, the Court finds that there are genuine issues of material fact which preclude summary judgment in favor of the Defendants.  Construing the facts in a light most favorable to the Plaintiffs, Teresa, although crying, yelling, and cursing, was cooperating with the officers before Johnson used force to slam her head into the wall.  Further, at the time Johnson slammed her head into the wall, she was not armed; she was (according to Brian), no longer intoxicated; and the officers had not used alternative methods of subduing her, aside from verbal instructions. There was, at that point, no evidence that Teresa was a risk of escape and no evidence that she threatened anyone.

Additionally, reasonable minds could differ as to the exigency of the moment and, given the potential unreliability of Deana's account, the known character of Teresa.

Finally, although the issue was not raised by the parties, the Court finds the immunity provided to officers in La. Rev. Stat. § 28:53(L)(3) inapplicable. This section provides:

> In the case of a person suffering *from substance abuse and where any of the above facilities are unavailable*, the peace officer and emergency medical service technician may use whatever means or facilities available to protect the health and safety of the person suffering from substance abuse until such time as any of the above facilities become available. In taking a person into protective custody the peace officer and emergency medical service technician may take reasonable steps to protect themselves. *A peace officer or emergency medical service technician who acts in compliance with this section is acting in the course of his official duty and cannot be subjected to criminal or civil liability as a result thereof.*

(emphasis added). "Substance abuse" is defined in La. Rev. Stat. § 28:2(29) as "the condition of a person who uses … alcohol to the extent that it renders the person dangerous to himself or others or renders the person gravely disabled." It is questionable whether Defendant's asserted this immunity, which was not briefed at all by the Defendants.[6] More importantly, as discussed above, there are issues of fact as to whether the officers acted "in compliance with" La. Rev. Stat. § 28:53(L).

In short, there are too many issues of fact in this fact-intensive inquiry to dismiss Teresa's claims for battery against Johnson and Erdey. Accordingly, their motions for summary judgment are denied.

---

[6] While Defendants expressly asserted as an affirmative defense the qualified immunity and immunity under La. Rev. Stat. § 9:2798.1 (See Answer, R. Doc. 8, p. 2), Defendants did not expressly assert this defense. They do assert in their Eleventh Affirmative Defense: "*In the event that judgment is rendered against Defendants*, Defendants plead the statutory limitation of liability, interest, and costs under La. R.S. 13:5106 and La. R.S. 13: 5112, as well as any other statutory or jurisprudential limitation of liability applicable herein." (emphasis added). But this statute would preclude judgment in favor of the Plaintiffs in the first place, so Defendants arguably did not assert La. Rev. Stat. § 28:53(L) as an affirmative defense. Given the above reasoning though, the Court need not decide this issue at this time.

### G. Malicious Prosecution – Federal and State Law

*1. Parties Arguments*

The Defendants' argue that the Plaintiffs cannot recover on their malicious prosecution claims under state or federal law. On the latter, Defendants argue that malicious prosecution is not actionable under section 1983 in the Fifth Circuit. On the state law claim, Defendants argue that the Plaintiffs cannot recover because an essential element of their claim fails – specifically, that the prosecution did not end favorably in their favor because the prosecution decided not to initiate formal proceedings against them.

Plaintiffs argue that claim is viable under section 1983 if it is linked to another Fourth Amendment violation. Further, Plaintiffs claim that Defendants cite to outdated law and that they can recover under Louisiana law even if the prosecution decides not to press charges.

*2. Malicious Prosecution Under Federal Law*

Under Fifth Circuit precedent, malicious prosecution standing alone is not a violation of the United States Constitution. *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003); *Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009). In *Castellano*, the Fifth Circuit explained that a claim under § 1983 "must rest upon a denial of rights secured under federal and not state law." 352 F.3d at 942. The court examined the Supreme Court's opinion in *Albright v. Olivier*, 510 U.S. 266, 114 S.Ct. 807 (1994) and determined that the Court had:

> [R]ejected the contention that the initiation of criminal proceedings without probable cause is a violation of substantive due process, holding that petitioner must look to the explicit text of the Fourth Amendment as a source of protection for the "particular sort of government behavior" at issue. To the point, *causing charges to be filed without probable cause will not without more violate the Constitution. So defined, the assertion of malicious prosecution states no constitutional claim.* It is equally apparent that additional government acts that may attend the initiation of a criminal charge could give rise to claims of constitutional deprivation.

The initiation of criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example, or other constitutionally secured rights if a case is further pursued. *Such claims of lost constitutional rights are for violation of rights locatable in constitutional text, and some such claims may be made under 42 U.S.C. § 1983. Regardless, they are not claims for malicious prosecution and labeling them as such only invites confusion.*

*Castellano v. Fragozo,* 352 F.3d 939, 953-54 (5th Cir. 2003) (emphasis added).

The Fifth Circuit has also described the claim for malicious prosecution as not "independently cognizable" under §1983. *Deville v. Marcantel*, 567 F.3d 156, 169-70 (5th Cir. 2009). Instead, the court has explained:

it must be shown that the officials violated specific constitutional rights in connection with a "malicious prosecution." For example, "the initiation of criminal charges without probable cause may set in force events that run afoul of the ... Fourth Amendment if the accused is seized and arrested ... or other constitutionally secured rights if a case is further pursued." *However, these "are not claims for malicious prosecution."* Accordingly, plaintiffs' claim under § 1983 for "malicious prosecution" in respect to the May 2006 arrest is not independently cognizable, and defendants are therefore entitled to summary judgment on that claim.

*Deville v. Marcantel*, 567 F.3d 156, 169-70 (5th Cir. 2009) (citations omitted) (emphasis added).

Applying these standards, the Plaintiffs were required to submit evidence of specific constitutional violations in connection with a "malicious prosecution."  Construing the facts in a light most favorable to the plaintiffs, they have submitted proof only that they were arrested without probable cause.  As articulated by *Deville* and *Castellano*, this is a claim for a violation of a constitutional right, and the Court explained that analysis above.  But this is not a claim for malicious prosecution.  Accordingly, the Plaintiff's claims for malicious prosecution under § 1983 are dismissed.

*3. Malicious Prosecution Under State Law*

"Unlike federal law, Louisiana recognizes a cause of action for malicious prosecution."

*Deville*, 567 F.3d at 173. The elements of a Louisiana state law malicious prosecution claim are:

"(1) the commencement or continuance of an original criminal or civil judicial proceeding; (2) its

legal causation by the present defendant in the original proceeding; (3) its bona fide termination

in favor of the present plaintiff; (4) the absence of probable cause for such proceeding; (5) the

presence of malice therein; and (6) damage conforming to legal standards resulting to plaintiff."

*Lemoine v. Wolfe*, 2014-1546 (La. 3/17/15), --- So. 3d ---- , (La. 3/17/15).

The third element is at issue here. Defendants contend that a *nolle prosequi* is not a bona

fide termination in favor of the malicious prosecution plaintiff. The Plaintiffs respond that the

Defendants rely on outdated law.

Ordinarily, the plaintiff bears the burden of proof for all elements of a malicious

prosecution claim. However, where the prosecutor has dismissed the charge prior to trial, there is

a presumption of lack of probable cause and malice, and the defendant bears the burden of

proving he acted on probable cause and without malice. *See, e.g., Hope v. City Of Shreveport*,

37,759 (La. App. 2 Cir. 12/17/03), 862 So. 2d 1139, 1143;

Here, the Plaintiffs are correct in that Defendants cite old law as to a *nolle prosequi*. On

March 17, 2015, the Louisiana Supreme Court in *Lemoine v. Wolfe* held that a voluntary

dismissal of criminal charges pursuant to La. Code Crim. Proc. art. 691 (a *nolle prosequi*)

generally is a bona fide termination in the plaintiff's favor for purposes of a subsequent

malicious prosecution action. 2014-1546 (La. 3/17/15), --- So. 3d ---- , 2015 WL 1212165, at *5-

8. While exceptions to this rule apply,[7] none are applicable here.

---

[7] The Louisiana Supreme Court explained how Louisiana courts have followed the American Law
Institute's Restatement (Second) of Torts and that:

Here, the Plaintiffs have satisfied the first two elements. First, Teresa was arrested and charged with resisting an officer and battery of an officer. This constituted the commencement of a criminal proceeding. *See Plessy v. Hayes Motor Co., Inc.*, 742 So.2d 934, 938 (La.App. 2 Cir. 6/16/99) ("[t]here was the commencement of a criminal proceeding against Plessy based upon the charge of unauthorized use of a movable."). Second, the commencement of the action was caused, as Teresa attests in her affidavit (Doc. 62-4, p. 1), by the charges of resisting an officer and battery of a police officer made against her by Johnson.

As to the third element, Teresa attests to the fact that the District Attorney informed her that Deputy Johnson's charges against her would not be pursued. (Doc. 62-4, p.1). Thus, this element is met.

The Defendant did not address the fourth and fifth elements in his motion for summary judgment other than the statement that "plaintiffs cannot prove any other element of the malicious prosecution claim." This is insufficient to overcome the presumption of malice and a lack of probable cause created where the prosecutor has dismissed the charges prior to trial. Finally, as will be discussed *infra* in the Intentional Infliction of Emotional Distress section, Plaintiffs have proven damages.

Thus, the Defendants' motion for summary judgment as to the state law malicious prosecution claim is denied.

---

[u]nder the Restatement, for purposes of the termination requirement of a malicious prosecution claim, a criminal proceeding has been terminated in favor of the accused when a prosecutor formally abandons the proceeding via a nolle prosequi, … *unless* the abandonment is for reasons not indicative of the innocence of the accused, such as when the *nolle prosequi* is the result of an agreement or compromise with the accused … , misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial.

2015 WL 1212165, at *6 (citing Restatement (Second) of Torts §§ 659, 660, 661 (1977)).

### H. Failure to Provide Medical Care – Fourth Amendment

In *Hare v. City of Corinth, Miss.*, 74 F.3d 633 (5th Cir. 1996), the Fifth Circuit held that pretrial detainees are offered under the Fourteenth Amendment the same right to adequate medical care as inmates are afforded under the Eighth Amendment. Under both, the deliberate indifference standard applies; liability attaches for episodic acts or omissions only if the "official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk." *Id.* at 650.

The Fifth Circuit has also held:

> An arrestee's complaint for denial of substantive due process and a pretrial detainee's complaint for denial of substantive due process are evaluated under the same standards. … After the initial incidents of a seizure have concluded and an individual is being detained by police officials but has yet to be booked, an arrestee's right to medical attention, like that of a pretrial detainee, derives from the Fourteenth Amendment.

*Nerren v. Livingston Police Dept.*, 86 F.3d 469, 472-473 (5th Cir. 1996). The *Nerren* court found no reason to distinguish between arrestees and pretrial detainees because the former was a subset of the latter.

Here, the Court finds no reason to apply a different standard to those held for mental health evaluations than for arrestees and other pretrial detainees. To prevail, Plaintiffs must prove subjective deliberate indifference.

Additionally, the Fifth Circuit has recognized that "a detainee must show that the defendant 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Lacy v. Shaw*, 357 F. App'x 607, 609 (5th Cir. 2009) (quoting *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985)). Moreover, "negligent medical care does not

constitute a valid § 1983 claim." *Id.* at 609-10 (citing *Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993)).

Even assuming that the Plaintiffs had proven that Defendants were aware of a substantial risk of serious harm to Teresa, the Court finds that Teresa failed to prove deliberate indifference. As stated above, Teresa testified that, after she was injured, she was cursing at everybody and saying "fuck you." (R. Doc. 52-9, p. 11). She also told the paramedics not to touch her "because at that point, [she] did not trust them." (*Id.*). Erdey also testified that she refused medical treatment by Acadian. (R. Doc. 62-5, p. 34-35). She was told that she could go to jail or to the hospital by one of the officers. (*Id.*, p. 35). Despite this, Erdey said that it had already been determined that she would go to jail. (*Id.*, p. 36). Erdey explained that one of the officers lied because she had already cussed, yelled, and become very angry, and they did not want things to escalate as they brought her down the stairs. (*Id.*).

While the officers may have been unwise to lie to Teresa about the offer of a trip to the hospital, they cannot be said to have been deliberately indifferent to her medical needs. The Court cannot conclude that Johnson "refused to treat [her] [or] ignored [her] complaints." Teresa is the one that refused medical treatment, not Johnson or Erdey.

The Court is also guided by the principle that "the fact that a plaintiff disagrees with what medical care is appropriate or with the course of treatment offered by the medical staff does not state a claim of deliberate indifference to serious medical needs." *Orange v. Geo Grp., Inc.*, No. CIV.A. 14-806, 2015 WL 1401987, at *3 (W.D. La. Mar. 25, 2015) (citation omitted) (applying standard in prisoner case). Here, Teresa may have disagreed with the use of the paramedics as treatment for her injuries, but that does not mean that Johnson or Erdey were deliberately indifferent.

Finally, this Court has dismissed a § 1983 plaintiff's claim for failure to provide medical treatment when the plaintiff refused medical treatment. *Hoffpauir v. Columbia Cas. Co.*, No. CIV.A. 12-403-JJB, 2013 WL 5934699, at *5 (M.D. La. Nov. 5, 2013).  This is an additional reason for granting summary judgment.

In sum, even assuming that there was a serious medical need and that the officers were aware of it, the Plaintiffs have failed to show deliberate indifference.  Accordingly, Defendants' motions to dismiss the claims against Erdey and Johnson for failure to provide adequate medical care are granted, and those claims are dismissed.

### I.   Intentional Infliction of Emotional Distress – State Law

The Louisiana Supreme Court has held:

> in order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct.

*White Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991).

As to the first element, the Louisiana Supreme Court has also said:

> The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.

*Id.*

This first element turns in part on whether Johnson and Erdy had probable cause to detain and/or arrest Teresa.  Because the Court concluded that no reasonable officer would think that detention or arrest was justified in this case, then the logical conclusion is that a reasonable jury could find that such conduct – arrest or detention in the middle of the night in one's home

without probable cause– is so beyond all possible bounds of decency that it is atrocious and utterly intolerable.

This finding is bolstered by other facts. Construing the facts in a light most favorable to the Plaintiffs, Johnson admitted that he lacked the ability to assess whether she was suicidal. (R. Doc. 39-2, p. 49). He delved into extremely sensitive areas of her life and asked probing questions when assessing Teresa, and that was properly the job of the paramedics and coroner. Brian testified that the questioning (done "primarily" by Johnson, which means Erdey was involved as well) was aggressive (R. Doc. 52-4, p. 10), and it clearly upset Teresa greatly. She yelled and shouted. Yet Johnson continued the questioning. Construing the facts in a light most favorable to the Plaintiffs, a reasonable jury could find that Johnson's conduct was outrageous given her distress at his questioning, his failure to leave the interrogation to the trained professionals, and his exceeding the scope of his purpose there.

There is no doubt that the Plaintiffs have raised an issue of fact as to the second element – severe emotional distress. Teresa said she's angry a lot and feels unsafe. (R. Doc. 62-7, p. 2). Her "safety and security [have] been compromised which causes a very high level of anxiety to the point where I have anxiety in situations that to [her] are unreasonable, such as … [the] commute back and forth from Walker to Baton Rouge six to seven days a week …" (*Id.*, p. 2-3). "[E]ven being on the interstate sparks anxiety, and [she doesn't] know why. [She has] situations that to [her] are unreasonable that [she] would have anxiety that [she doesn't] have control over." (*Id.*, p. 3). It also affected her as a mother because her daughter witnessed the incident and was involved with it. (*Id.*). Additionally, it has affected her marriage; while before their marriage was "the most solid and stable," because Brian was unable to protect her, she blames him (*Id.*, p.

4-5). Brian now has to communicate with her more about his whereabouts because she has anxiety. (*Id.*, p. 5).

Finally, there is at least an issue of fact as to whether the officers knew that severe emotional distress would be likely to follow. A reasonable officer would know that seizure without probable cause in the middle of the night in one's home would cause severe emotional distress. A juror could also draw the inference that the officers knew that Johnson's intrusive questioning would continue to make Teresa upset given Teresa's reaction to it. The same inference can be drawn from handcuffing or arresting her. Accordingly, summary judgment on this issue is denied.

### J. Punitive Damages – Federal and State Law

To recover punitive damages under § 1983, the plaintiff must show that the officer's conduct was motivated by "evil motive or intent" or involved "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640 (1983). Here, construing the facts in a light most favorable to the Plaintiffs, Johnson intentionally rammed Teresa's head into the wall, and Erdey either knew this was going to happen or signaled for it to happen. Under these circumstances, the Court rejects Defendants' argument that there is no evidence from which a reasonable trier of fact could award punitive damages. Additionally, the same reasons articulated above concerning why, construing the facts in a light most favorable to the Plaintiffs, the Defendants' conduct was extreme and outrageous for purposes of intentional infliction of emotional distress are equally applicable here. This portion of Defendants' motion is denied.

However, "[p]unitive damages are not allowed under Louisiana law in absence of a specific statutory provision." *Hoffpauir v. Columbia Cas. Co.*, No. CIV.A. 12-403-JJB, 2013

5934699, at *14 (M.D. La. Nov. 5, 2013) (quoting *Zaffuto v. City of Hammond*, 308 F.3d 485, 491 (5th Cir. 2002)).  Because Louisiana law does not have a specific statute allowing for the recovery of punitive damages for Plaintiffs' state law claims, Plaintiffs' claim for punitive damages under Louisiana state law is dismissed.

### K.  Loss of Consortium – State Law

Defendants argue that, since the Plaintiffs' state law claims fail, the loss of consortium claim fails too.  But since the Court has found that the state law claims survive, the Defendants' motion for summary judgment on this issue is denied.

### III.     *Motion for Partial Summary Judgment on Behalf of Columbia Casualty Company (Doc. 56)*

In its motion, Columbia "adopt[ed] and incorporat[ed] the memoranda submitted in support of" the above two motions. (Doc. 56-2).  Because Columbia "has made no additional arguments in their motion for summary judgment, other than adopting the facts and arguments offered by" Defendants Erdey and Johnson, "the same findings on summary judgment will apply" to Columbia. *Hoffpauir v. Columbia Cas. Co.*, No. CIV.A.. 12-403-JJB, 2013 WL 5934699, at *14 (M.D. La. Nov. 5, 2013).

Thus, the Court dismisses claims against Columbia (1) for Johnson and Erdey's alleged unlawful entry into the Plaintiffs' home in violation of the Plaintiffs' Fourth Amendment rights; (2) for malicious prosecution under federal law; (3) for the alleged failure to provide medical care in violation of Teresa's Fourth Amendment rights; and (4) for punitive damages under Louisiana state law.  Further, the Court dismisses the claim against Columbia for Erdey's false arrest under the Fourth Amendment and Louisiana state law.   In all other respects, Columbia's motion is denied.

*IV.*     *Motion for Partial Summary Judgment (Doc. 39) by Plaintiffs*

Plaintiffs have sought partial summary judgment as to some of their claims against Johnson. Specifically, Plaintiffs seek recovery for alleged violations of their Fourth Amendment rights for false arrest, unlawful seizure, and excessive and unreasonable force and for the Louisiana state law torts of battery and false imprisonment. For the following reasons, Plaintiffs motion is denied.

### A. False Arrest/Unlawful Seizure - Fourth Amendment

Just as there were issues of fact that preclude entry of summary judgment in favor of Erdey and Johnson, so too are there issues of fact that warrant a denial of summary judgment on the Goldens' claims. The same issues of fact detailed above - concerning Teresa's intoxication, cooperation, statements on the phone, risk of violence, and reliability of Deana's report - permeate the analysis here and make summary judgment inappropriate as to the mental health seizure.

Further, construing the facts in a light most favorable to Johnson, the officer spoke with Teresa's sister and was told specifically that Teresa was using language similar to that used when she attempted suicide in the past, that Teresa had apologized, and that Teresa had tried to cut her wrists and throat in the past. (R. Doc. 39-2, p. 15-16; R. Doc. 52-5, p. 13, 15). On the night of the incident, Teresa was extremely intoxicated (R. Doc. 52-5, p. 24), and, according to her own daughter, hysterical and going berserk (R. Doc. 52-10, 2). She was yelling very loudly, swearing a lot and gesticulating wildly (R. Doc. 39-2, p. 26), and she had "exaggerated movement." (R. Doc. 52-5, p. 27). The paramedics both stated that Teresa would not answer questions so that the medical assessment could be completed. (R. Doc. 52-7, p. 4; R. Doc. 52-8, p. 3-4). Teresa was restrained, according to the Defendants, because the situation was escalating and, according to

the paramedics, because they could not complete the medical assessment. (*Id.*; R. Doc. 39-2, p. 30, 4; R. Doc. 52-6, p. 9). Considering the facts in a light most favorable to the Defendants, a reasonable juror could conclude that there was no wrongful seizure for a mental health evaluation.

Similarly, because a reasonable juror could find that the seizure was proper, a reasonable juror could also find that Teresa's resistance was unlawful. Moreover, Johnson and Sloan both testified that Teresa kicked Johnson (R. Doc. 52-7, p. 4; R. Doc. 53-6, p. 32), which, if unjustified, would be a battery of an officer. Accordingly, the Plaintiffs' motion for partial summary judgment against Johnson for unlawful seizure is denied.

### B. False Imprisonment – State law

For the same reasons, the Court denies Plaintiffs' motion for summary judgment on the false imprisonment claim under Louisiana law. As stated above, the key issue here is whether Johnson had probable cause for the seizure and arrest. *Cook v. Perkins*, No. 12-258, 2013 WL 5720327, at *5 (M.D. La. Oct. 21, 2013). Because a reasonable juror could find that he did, summary judgment on this issue is denied.

### C. Excessive and Unreasonable Force – Fourth Amendment

Construing the facts in a light most favorable to Johnson, a reasonable juror could conclude that the use of force against Teresa was not excessive to the need or objectively unreasonable. Several witnesses say that Teresa was resisting the officer and paramedics' attempts to assess her psychological condition. (R. Doc. 52-7, p. 4; R. Doc. 52-8, p. 3-4; R. Doc. 39-2, p. 30, 4; R. Doc. 52-6, p. 9). As stated above, she was, according to several witnesses, extremely drunk, hysterical, shaking, and going berserk. Considering the call from Deana and

Teresa's reaction to questions about the call to the officers, a reasonable juror could conclude that Teresa was an immediate threat to herself and that detention was proper.

Further, there is a factual question concerning Teresa's head striking the wall. While the Plaintiffs argue that the head was intentionally slammed into the wall, Johnson testified that she hit her head when she pulled away from Johnson as he was trying to handcuff her. (R. Doc. 39-2, p. 47-48). While evil intent is not relevant for an excessive force claim, the issue of whether her head was slammed into the wall by Johnson or whether Teresa herself was responsible when she pulled away is relevant to the objective reasonableness of the action. This issue of material fact also makes summary judgment inappropriate. Accordingly, the Plaintiffs' motion for partial summary judgment on the excessive force claim is denied.

### D. Battery – State Law

The Court denies Plaintiffs' motion as to the state law battery claim. As stated above, the police officers are entitled to a privilege on this claim so long as their force is not excessive or unreasonable. *Simmons*, 2008 WL 3976928, at *5. Applying the above factors from *Ross* to evaluate Johnson's reasonableness, and construing the facts in a light most favorable to the Defendants, a reasonable juror could conclude that (1) Teresa's "known character" was that of a suicide risk who had attempted violence on herself in the past; (2) that, based on the call with Deana and his own observations of Teresa's hysterical, berserk conduct and extreme intoxication, Teresa was a risk or danger to herself; (3) that Teresa refused to listen to the officers; and (4) the moment was exigent. Accordingly, summary judgment on this claim is denied.

## CONCLUSION

Accordingly,

**IT IS ORDERED** that the Cross-Motion for Partial Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment on Behalf of Deputy Brandon Johnson (R. Doc. 52), the Motion for Partial Summary Judgment on Behalf of Sergeant Steven Erdey (R. Doc. 53), and the Motion for Partial Summary Judgment on Behalf of Columbia Casualty Company (R. Doc. 56) are **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that claims against Johnson, Erdey, and Columbia (1) for Johnson and Erdey's alleged unlawful entry into the Plaintiffs' home in violation of the Plaintiffs' Fourth Amendment rights; (2) for malicious prosecution under federal law; (3) for the alleged failure to provide medical care in violation of Teresa Golden's Fourth Amendment rights; and (4) for punitive damages under Louisiana state law, are hereby **DISMISSED**;

**IT IS FURTHER ORDERED** that the claims against Erdey for false arrest in violation of the Fourth Amendment and Louisiana state law are **DISMISSED**;

**IT IS FURTHER ORDERED** that, in all other respects, the Defendants' motions (R. Doc. 52, 53, & 56) are **DENIED**; and

**IT IS FURTHER ORDERED** the Motion for Partial Summary Judgment (R. Doc. 39) by Plaintiffs Teresa Clifton Golden and Brian Golden is **DENIED**.

Signed in Baton Rouge, Louisiana, on June 11, 2015.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**